EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN J. GERARDINO y SIXTO LUCCIONI, acusados y apelantes.

No. 2750.—*Visto:* Enero 24, 1927. *Resuelto:* Julio 20, 1927.

1. DERECHO PENAL—JUICIO—CURSO DEL, Y FORMA EN QUE SE CONDUCE EL JUICIO—OBJECIONES—NOMBRAMIENTO DE FISCALES ESPECIALES.—La cuestión que, relativa a que El Pueblo esté representado en juicio por un fiscal no del distrito en que se ve la causa sino por uno de otro distrito y un fiscal especial, se levante en el acto del juicio es tardía.

2. DERECHO PENAL—FECHA DEL JUICIO Y SUSPENSIÓN—SOBRESEIMIENTO DE LA CAUSA O DEL PROCESO—TARDANZA EN CELEBRAR EL JUICIO O EN PRESENTAR LA ACUSACIÓN—JUICIO NO CELEBRADO DENTRO DEL TÉRMINO—EN GENERAL.—Cuando el motivo de una corte al posponer un juicio, es la renuncia de los acusados "a un juicio rápido y a todos los derechos que pudieran favorecerle" para así obtener la suspensión que de otro modo, y dado el trabajo de la corte, quizás ésta denegaría, tal renuncia se refiere a los subsiguientes 120 días después de dicha suspensión y quedando sujetos a que su caso pudiera celebrarse dentro de las circunstancias que le fuera permitido a la corte, la corte está justificada en negar el sobreseimiento del caso transcurrido los 120 días siguientes a dicha suspensión.

3. DERECHO PENAL—APELACIÓN Y ERROR, Y *Certiorari*—PRESENTACIÓN Y RESERVA EN LA CORTE INFERIOR DE LOS FUNDAMENTOS DE REVISIÓN—NECESIDAD DE QUE LAS CUESTIONES SE PRESENTEN EN LA CORTE INFERIOR—EN GENERAL—COMPARECENCIA POR ABOGADO NO AUTORIZADO.—Un acusado que se crea perjudicado por la actuación de un abogado al pedir éste la suspensión del juicio sin haberle aquél autorizado para ello debe protestar de tal actuación entonces y no levantar la cuestión por vez primera en apelación.

4. "INDICTMENT" Y ACUSACIÓN—REQUISITOS Y SUFICIENCIA DE LA ACUSACIÓN—SOLICITUD SOBRE MAYOR ESPECIFICACIÓN *(Bill of Particulars)*—CASOS EN QUE PROCEDE EN GENERAL.—Cuando en acusación por conspiración con el fin de desfraudar, los actos ilegales que se imputan realizados por los acusados se alegan específicamente y dan suficiente conocimiento a los acusados para saber su naturaleza y defenderse de los mismos, aquéllos no tienen que detallarse minuciosamente y no comete error la corte que declara sin lugar una moción sobre mayor especificación *(bill of particulars).*

5. Conspiración—Responsabilidad Criminal—Proceso y Castigo—Acusación Fiscal o Denuncia—Conspiración con el Fin de Defraudar en General.—La acusación por conspiración—con el fin de defraudar—presentada en el caso de autos *se resolvió* contiene todos los elementos que constituyen dicho delito.

6. Derecho Penal—Apelación y Error, y *Certiorari*—Revisión — Cuestiones Discrecionales—Resoluciones en Cuanto a la Acusación o a las Alegaciones *(Pleas)*—Resolución Sobre Moción Solicitando Mayor Especificación de Particulares.—Dirigiéndose una moción solicitando mayor especificación de particulares *(bill of particulars)* a la discreción de la corte, cuando nada indica abuso de discreción por parte de la corte al denegar dicha moción, la actuación de la corte debe sostenerse en cuanto a tal extremo.

7. Derecho Penal—Evidencia—Evidencia de Opinión—Testigos—Conocimiento que Tiene Sobre Una Cuestión—En General.—Un Gerente General de una compañía de seguros puede contestar, sin previa preparación en cuanto a su capacidad pericial, sobre los requisitos necesarios a llenar para obtener un seguro de primera clase.

8. Derecho Penal—Juicio—Curso del, y Forma en que se Conduce el Juicio—En General.—El permitir a un testigo declarar mediante intérprete descansa en la sana discreción de la corte, y a menos que se demuestre un abuso de tal discreción, debe sostenerse la actuación de la corte en cuanto a ese extremo.

9. Conspiración—Responsabilidad Criminal—Proceso y Castigo—De la Evidencia en General—En General.—En proceso por conspiración con el fin de defraudar una compañía aseguradora, un gerente general de ésta que haya intervenido personalmente en la expedición de la póliza puede declarar acerca del interés que podían tener en la póliza los beneficiarios—acusados—especialmente cuando el testigo en sus manifestaciones habla de entrevistas tenidas con uno de ellos ya fallecida la persona asegurada.

10. Derecho Penal—Juicio—Recepción de Pruebas—Exclusión de Testigos de la Sala—Facultad de la Corte para Ello.—El permitir a un testigo permanecer en sala para asistir o ayudar al fiscal en la dirección de la prueba, mientras otros han sido excluídos de ella bajo las reglas de la corte, descansa en la sana discreción judicial.

11. Conspiración—Responsabilidad Criminal—Proceso y Castigo—De la Evidencia en General—Admisibilidad—Hechos Colaterales para Determinar la Intención, Designio o Fin de los Acusados.—Cuando la culpabilidad de unos acusados depende de la intención, fin o designio con que se realizó el acto, pueden examinarse hechos colaterales para determinar tal intención, designio o fin siempre que éstos tengan alguna relación el uno con el otro como parte de un mismo plan o hayan sido inducidos por el mismo motivo aún cuando ellos demuestren la comisión de otros delitos.

12. Derecho Penal—Evidencia—Evidencia de Opinión—Testigos—Conclusiones y Opiniones de Testigos en General—Condición Física o Apariencia de una Persona—Aspecto Enfermo de la Misma.—La declaración de profanos que han visto morir a varias personas de tuberculosis o que han observado el aspecto enfermo de uno así como los signos físicos progresivos de dicha enfermedad, es admisible como datos o circunstancias, para ser apreciados por el tribunal en relación con los demás elementos de prueba.

13. Derecho Penal—Apelación y Error, y *Certiorari*—Revisión — Cuestiones Sobre las Pruebas—Apreciación de las Pruebas—Prueba Contradicto-

ria.—Cuando la prueba es contradictoria, el conflicto es dirimido por el juez sentenciador y nada hay que demuestre que hubo error o que el juez fuera movido por pasión, prejuicio o parcialidad en su aprobación, ésta debe sostenerse.

14. Derecho Penal—Apelación y Error, y *Certiorari*—Presentación y Reserva en la Corte Inferior de los Fundamentos de Revisión—Necesidad de que las Cuestiones se Presenten en la Corte Inferior—Sentencia Dictada Fuera del Término.—La cuestión relativa a que una corte abusó de su discreción al dictar sentencia fuera del término estatutorio se presenta tardíamente cuando se levanta por vez primera en apelación.

15. Derecho Penal—Evidencia—Peso y Suficiencia—Lugar del Juicio *(Venue)*.—En el caso de autos—proceso por conspiración con el fin de defraudar—*se resolvió* que la jurisdicción de la corte quedó plenamente probada.

Sentencia de R. Díaz Cintrón, J. (Ponce), condenando a los acusados por delito de conspiración. *Confirmada.*

*Felipe Colón Díaz, Angel Fiol Negrón, José R. Gelpí* y *José Tous Soto,* abogados de los apelantes; *José E. Figueras,* abogado de *El Pueblo,* apelado.

El Juez Asociado Señor Franco Soto, emitió la opinión del tribunal.

Los acusados Juan J. Gerardino y Sixto Luccioni fueron convictos de un delito de conspiración por la Corte Municipal de Ponce y apelada la sentencia la corte inferior, en un juicio *de novo,* les declaró culpables, imponiendo al primero seis meses de cárcel y $500 de multa, y al segundo en el último concepto la suma de $100.

Los acusados han establecido esta segunda apelación y señalan en su alegato la comisión de 21 errores, que analizaremos en el curso de esta opinión.

[1] Se quejan los acusados de que el gobierno estuviese representado en el juicio por los fiscales Romany y Samalea, el primero Fiscal de Distrito de Mayagüez y el segundo fiscal especial, y no por el Fiscal del Distrito de Ponce, Agustín E. Font, sin probarse ningún motivo que impidiera a este último actuar como tal fiscal en la causa. Esta cuestión fué resuelta recientemente de manera adversa a los acusados en el caso de *El Pueblo* v. *Pabón,* 36 D.P.R. 97, en el que esta corte dijo lo siguiente:

"El acusado en el acto de darle lectura a la acusación, hizo la

alegación de inocencia, sin haber levantado la cuestión que se suscita por este error. Dejó para plantearla en el acto del juicio cuando ya era tarde para hacerlo. En el caso de *El Pueblo* v. *Aponte,* 9 D.P.R. 386, no sólo resuelve el punto técnicamente sino que entra en los méritos diciendo:

"'Es evidente que el Attorney General, no solamente tiene las mismas facultades que el fiscal de cualquier distrito, sino que puede encomendarlas a cualquier agente especial, porque solamente es el que puede juzgar con respecto a la necesidad que exija el nombramiento de dicho abogado especial.

✳     ✳     ✳     ✳     ✳     ✳     ✳

"'Por lo tanto, el Attorney General necesariamente debe tener la facultad de ser representado por otras personas a menos que haya algún precepto absoluto de ley que lo prohiba, el cual no hemos podido encontrar.'

"Véanse además los casos de *El Pueblo* v. *Rivera,* 9 D.P.R. 505; *El Pueblo* v. *Meléndez,* 9 D.P.R. 550; y *El Pueblo* v. *París,* 25 D.P.R. 111."

[2] Los acusados solicitaron el sobreseimiento de la acusación porque habían transcurrido 321 días desde el 12 de marzo de 1924, en que se radicó el récord de la apelación de la corte de distrito, hasta el 26 de febrero de 1925, fecha en que fué celebrado el juicio.

El fiscal se opuso y presentó prueba tendente a demostrar que existió una justa causa que justificaba la razón de no haberse celebrado el juicio a pesar del tiempo transcurrido. La prueba consistió en la declaración de Emeterio Gotay, Secretario de la Corte de Distrito de Ponce. Este declara que el caso había sido señalado para el 15 de octubre de 1924 pero que fué suspendido a petición de los acusados. En cuanto a las mociones presentadas con ese objeto, el testigo, en parte, dice:

P.—¿Y cuántos acusados hay? R.—Dos. P.—¿Qué es eso? R. —Esta es otra moción presentada originalmente en esta Corte por el abogado Tous Soto. P.—¿Firma a nombre de quién? R.—Abogado de los acusados. P.—¿Y qué hace el señor Tous Soto como abogado de los acusados? R.—En esta moción suplica a la Corte la transferencia de la vista del caso para otra fecha de la que fué señalado.

P.—¿Y a qué se comprometió el señor Tous Soto en esa carta (*sic*) a nombre y en representación de los acusados? Defensor: Me opongo, porque eso lo dice la misma moción. Juez: Puede contestar. R.—Los acusados renuncian cualquier derecho a su favor. P. —¿Qué otro derecho renuncian ahí? R.—En esta moción no se hace más renuncia. P.—¿Qué otra moción hay en el caso? R.— Hay otra moción radicada originalmente en esta Corte por el abogado José Rosario Gelpí a nombre de la parte denunciada, pidiendo la suspensión del caso, de la vista que fué señalada en el término anterior, término de octubre y noviembre hasta un nuevo término. P.—¿Compareció a nombre de quién? R.—Compareció el·abogado José Rosario Gelpí a nombre de la parte denunciada. P.—¿Y a qué se comprometió? R.-—Renunció a un juicio rápido y a todos los derechos que puedan favorecerle, para que se suspenda la vista de este caso.''

El secretario refiere también el trabajo constante en asuntos criminales y civiles en que estuvo ocupada la corte en los términos que siguieron a la fecha en que se accedió por la corte a la suspensión del juicio.

Debido, sin duda, al trabajo que pesaba sobre la corte y a que esto pudiera ser un motivo para que la corte negara la suspensión, los acusados no se limitaron a pedir simplemente la posposición del juicio sino que ofrecieron renunciar ''a un juicio rápido y a todos los derechos que pudieran favorecerle . . .'' para así obtener la suspensión. Esto no podía interpretarse en el sentido de que se le pudiera tener a los acusados indefinidamente sin celebrarse el juicio. Véase *El Pueblo* v. *Cepeda,* 31 D.P.R. 498, pero la renuncia de los acusados se refería por lo menos a los subsiguientes 120 días después de la primera suspensión y durante ese término ellos quedaron sujetos a que su caso pudiera celebrarse dentro de las circunstancias que le fuera permitido a la corte, ya que si en general hemos sostenido que el mucho trabajo de una corte no es por sí solo suficiente motivo para sobreponerlo al derecho del acusado, en este caso es de importancia en relación con la renuncia de los acusados y la razón que tuvo la corte para posponer el juicio. Tomando en conjunto todas las circunstancias concu-

rrentes, hay que concluir que la corte inferior estuvo justificada al negar el sobreseimiento del caso.

El acusado Luccioni alega por su parte que la moción de suspensión del juicio no se hizo a petición suya ni autorizó a nadie para que se pidiera a su nombre. No obstante esta contención, aparece del récord que la moción solicitando la posposición del juicio fué presentada por el abogado José Tous Soto en plural, a nombre de los acusados, y si el acusado Luccioni no dió tal autorización y se creyó perjudicado por tal actuación, fué en aquella oportunidad que debió protestar y no levantar en apelación la cuestión por primera vez.

[4, 5] Se sostiene que la corte erró al declarar sin lugar una moción (*bill of particulars*) por la que se pedía que se especificaran los actos realizados por cada uno de los denunciados a fin de tener conocimiento de los hechos de que deban responder ante la corte y defenderse en el juicio.

La acusación, en lo pertinente, dice:

"Los citados Juan J. Gerardino y Sixto Luccioni, . . . ilegal, voluntaria, maliciosa y fraudulentamente, obrando juntos y de común acuerdo, conspiraron y se pusieron de acuerdo para engañar y defraudar a la Compañía de Seguros de Vida 'The Manufacturers' Life Insurance Company,' corporación extranjera autorizada para hacer negocios en Puerto Rico, y con tal objeto, los citados Juan J. Gerardino y Sixto Luccioni, aseguraron a un tal Julio F. Rivera por la suma de Quince Mil Dólares en la citada corporación 'The Manufacturers' Life Insurance Company,' haciendo saber a dicha compañía que el nominado Julio F. Rivera se encontraba en buen estado de salud y era un riesgo de primera clase, a sabiendas dichos acusados de que el citado Rivera, a la fecha de ser asegurado, o sea allá por el mes de Mayo de 1923, se encontraba sufriendo de tuberculosis pulmonar, y bajo tal engaño voluntario y maliciosamente realizado, indujeron a la citada compañía a asegurar al referido Gerardino (*sic*) por la suma de quince mil dólares, para lo cual dicha compañía expidió una póliza a nombre de Julio F. Rivera, sin que el fraude se consumiera (*sic*) por haber sido cancelada la póliza allá por el mes de Noviembre de 1923, . . ."

La acusación contiene todos los elementos que constitu-

yen el delito de conspiración. Dos personas que obrando juntas y de común acuerdo conspiran con el propósito de engañar y defraudar a la compañía de seguros "The Manufacturers' Life Insurance Company" mediante los actos ilegales que se relatan en la misma. Tales actos que se imputan realizados por los acusados se alegan específicamente y ellos dan suficiente conocimiento a dichos acusados para saber su naturaleza y defenderse de los mismos. En la denuncia no se tenían que detallar aquellos actos minuciosamente. En una acusación por conspiración con el fin de defraudar, el propósito de los acusados puede ser alegado en términos generales sin descender a tales particularidades como se requiere el imputar una acusación por fraude. 5 R.C.L. 1083. Es necesario, sin embargo, que la acusación muestre claramente que el propósito de la conspiración era realizar un plan que de hecho es fraudulento (5 R.C.L. 1083) y esto aparece distintamente en la denuncia del presente caso.

[6] Además, la moción solicitando un *bill of particulars* se dirige a la discreción de la corte, y nada indica un abuso de discreción por parte de la corte al denegar dicha moción.

En el curso de la declaración del testigo Eliseo Font y Guillot se le mostró una solicitud del asegurado Julio F. Rivera para obtener de la compañía aseguradora una póliza de vida por $15,000. Se le interrogó por el fiscal de si el seguro que se solicitaba era de primera clase y se trataba de una póliza ordinaria de vida. Los apelantes objetaron aduciendo el fundamento de que la mejor prueba era el documento mismo. El propósito del fiscal, sin embargo, fué establecer la identidad del documento, toda vez que el declarante era el agente general de la compañía aseguradora en Puerto Rico y a él se referían todas las solicitudes que se hacían en relación con los seguros y negocios de la compañía en Puerto Rico. El interrogatorio se hizo extensivo a la prima que se pagó por la póliza y entonces trató de explicar que la nota de descargo que contenía la póliza signifi-

caba que la prima fué devuelta a los beneficiarios Juan J. Gerardino y Sixto Luccioni porque el asegurado estaba en mal estado de salud a la fecha de solicitar el seguro. La objeción de los apelantes era que el testigo estaba interpretando el alcance de los documentos, lo que era de la competencia de la corte. En rigor de verdad, el testigo no hizo sino exponer a la corte la intervención que tuvo en la nota de descargo, la que fué firmada a su presencia por ambos acusados. Además, los documentos fueron presentados en evidencia y la corte tuvo oportunidad de apreciar su alcance por ellos mismos y no por las manifestaciones del testigo.

Otro incidente de que se quejan los apelantes es que al testigo se le permitió declarar sobre la firma de Julio F. Rivera que aparece en la referida solicitud, sin haberle visto firmar ni estar familiarizado con la misma. Sin embargo, el testigo declaró que no estaba familiarizado con la firma de Rivera en la época de la confección de la solicitud pero que luego recibió de él varias firmas. Además, la solicitud aparecía firmada por los acusados como beneficiarios de la póliza y ellos en tal carácter fueron los que suscribieron la cancelación de la misma, la que había sido expedida en virtud de la referida solicitud. De suerte que no hubo el error alegado.

[7] Al testigo también se le preguntaron los requisitos que eran necesarios llenar para obtener un seguro de primera clase. Esto fué motivo de objeción porque no se había establecido previamente la capacidad pericial del testigo. El testigo contestó que todo asegurado para obtener un seguro de vida de primera clase tenía que estar en perfecto estado de salud, no tener historia clínica, es decir, no haber padecido de ninguna enfermedad. Era bien obvio, sin embargo, que el testigo pudiera contestar sin la previa preparación exigida en cuanto a su capacidad pericial sobre la materia, pues aparte de su condición de médico él era el gerente general de la compañía en la isla y como tal estaba familiarizado con las condiciones que se requerían por las

compañías de seguros para poder explicar lo que se entendía .por un seguro de primera clase.

[8] Durante la declaración del testigo William E. Young se suscitaron ciertos incidentes que se imputan como otros tantos errores cometidos por la corte.

Se sostiene como error que se permitiera declarar mediante intérprete al testigo, conociendo el idioma español. El testigo empezó declarando que hablaba el español, pero "poquito." El juez entonces permitió de plano que el examen del testigo se hiciera por medio de un intérprete. Seguramente la corte estuvo en condiciones por las primeras manifestaciones del testigo en castellano, por el grado de conocimiento que a la vista poseía de tal idioma, que él no podía ser sometido a un extenso .y laborioso interrogatorio en español y ella pudo apreciar mejor ese extremo. La cuestión, como es natural, entraba de lleno en la sana discreción de la corte, y a menos que se demostrara un abuso de tal facultad, lo que no se ha demostrado, se debe sostener su acción en ese punto.

"De acuerdo con el código, cuando un testigo no entiende ni habla el idioma inglés, debe tomársele juramento a un intérprete para que le interprete. El si es apropiado o no llamar un intérprete, es una cuestión discrecional de la corte sentenciadora, al igual que lo es la capacidad de la persona que se va a utilizar para servir de intérprete; y no se intervendrá en apelación en la actuación de la corte a menos que los autos demuestren un abuso de discreción." 8 Cal. Jur. 225.

[9] Se suscitó otra objeción al interrogar el ·fiscal al testigo acerca del interés que podían tener en la póliza los beneficiarios Juan J. Gerardino y Sixto Luccioni. La objeción descansaba en que el punto era para ser determinado por la corte y no por el testigo. Parece que los apelantes pasan por alto la naturaleza del cargo que se les imputa en la denuncia, estableciendo un caso de conspiración o confabulación entre los acusados con el fin de defraudar a la compañía aseguradora mediante falsas representaciones. La

pregunta tendía a establecer un hecho de inequívoca significación e importancia en el caso y era lógico que siendo el testigo el gerente del departamento latino-americano de The Manufacturers' Life Insurance Co., con jurisdicción en Puerto Rico, y habiendo intervenido personalmente en relación con la póliza expedida a nombre de Julio F. Rivera, pudiera declarar sobre un extremo que era de su conocimiento personal. El testigo en sus manifestaciones habla de varias entrevistas que tuvo con el acusado Juan J. Gerardino, ya fallecida la persona asegurada. En una de estas entrevistas Gerardino mostró al testigo un cheque por $3,000 que había librado pocos días después de la expedición de la póliza al asegurado Julio F. Rivera, endosado por éste y cobrado el mismo día. Con ello trataba de demostrar el interés asegurable que tenía en la póliza como garantía colateral de dicho préstamo. El testigo refiere que manifestó que la operación no le daba tal interés porque el asegurado no estaba en buen estado de salud en el momento en que se hizo el seguro y esto dice que fué admitido por el acusado. Este es el hecho de suyo decisivo que exponía a la consideración de la corte. La supuesta enfermedad del asegurado era el tinte cárdeno que teñía la intención siniestra y fraudulenta de los acusados en su conjura o confabulación para defraudar a la compañía aseguradora. Y no es prueba de referencia como otro motivo que alegan para sostener su objeción. Se trata de la excepción al *hearsay rule* de que hablan los artículos 19 y 35, No. 3, de la Ley de Evidencia. El interrogatorio fué pertinente y la actuación de la corte fué correcta al desestimar las objeciones de los apelantes.

[10] Hubo oposición a que el testigo Young permaneciera en la sala de la corte y se utilizara de nuevo como testigo. A moción del fiscal la corte acordó que el testigo estuviera al lado del fiscal porque podía ilustrarle en un momento dado durante el juicio. Estaba en la discreción de la corte acceder de conformidad a la moción del fiscal.

"Una corte al excluir testigos tiene discreción especialmente para que la orden se refiera a uno o más testigos, o para negarse a hacerlo así. Por ejemplo, la corte puede hacer excepción de cualquier persona que pueda ayudar al fiscal en la dirección de la prueba. La corte también puede excluir al alguacil del condado o a un jefe de policía cuando éstos son testigos." 8 Cal. Jur. 225.

[11] Al testigo Young también se le interrogó por el fiscal si había recibido alguna otra solicitud de seguro sobre la vida de Julio F. Rivera. El testigo contestó que recibió otra posterior a la del presente caso por $18,000, siendo el beneficiario un hermano del asegurado. La póliza ordinaria de vida se expidió y luego se canceló firmando la nota de descargo Rafael Rivera. Aparecía además que la prima de esta póliza fué satisfecha por el acusado Juan J. Gerardino. Asimismo fué preguntado acerca de la expedición de otras pólizas en las que Juan J. Gerardino tuvo cierta intervención en la expedición de las mismas. Los apelantes hicieron objeción alegando que las otras pólizas no tenían conexión alguna con los acusados.

Corpus Juris, tomo 12, pág. 637, tratando de la materia dice lo siguiente:

Cuando la culpabilidad de un individuo depende de la intención, fin o designio con que realizó el acto, o de su intención criminal, pueden examinarse hechos colaterales en que él tomó parte principal para determinar tal intención, designio o fin. Basta con que tales hechos colaterales tengan alguna relación el uno con el otro como parte de un mismo plan o que hayan sido inducidos por el mismo motivo, y no importa que ellos demuestren la comisión de otros delitos. La prueba en un caso de conspiración es quizá más amplia que en ningún otro caso. Tomados por sí solos los hechos en un caso de conspiración, son muy raras veces de naturaleza inequívocamente criminal, y pueden ser únicamente apreciados cuando se relacionan con todas las circunstancias que rodean el caso."

En la nota de los casos se cita jurisprudencia que parece de aplicación bajo las circunstancias concurrentes en este caso y que en lo pertinente dice así:

"(a) En una acusación criminal por el delito de conspiración

con el propósito de defraudar a los Estados Unidos de terrenos, es admisible prueba tendente a demostrar actos de falsificación en las solicitudes para el terreno, aunque no se esté tratando de castigar al acusado por el delito de falsificación, cuando tales actos están tan íntimamente relacionados con las otras actuaciones del acusado que tienden a demostrar un plan común con el fin de defraudar. Hyde v. U. S., 35 App. (D.C.) 451 (*certiorari* declarado con lugar, 218 U. S. 681 mem. 31 S Ct 228 mem. 54 L. ed. 1207 mem.).

"Con el objeto de probar una conspiración para cometer determinado fraude puede demostrarse que los mismos conspiradores cometieron frades similares contra terceros más o menos en la misma época o al ejecutar el mismo plan. Luckey v. Roberts, 25 Conn. 486; Gardner v. Preston, 2 Day (Conn.) 205, 2 Am. D. 91; Card v. State, 109 Ind. 415, 9 N. E. 591; State v. Soper, 118 Iowa 1, 91 NW 774; State v. McIntosh, 109 Iowa 209, 80 NW 349; Com. v. Eastman, 1 Cush. (Mass.) 189, 48 Am. D. 596; Peo. v. Peckens, 153 N. Y. 576, 47 N E 883; Brackett v. Griswold, 14 N Y St 449 (revocado por otros fundamentos 112 N. Y. 454, 20 NE 376); Peo. v. Bleeker, 2 Wheel. Cr. (N. Y.) 256; In re Hitchcock, 6 City Hall-Rec (N. Y.) 43; Com. v. Pugliese, 44 Pa. Super. 361; Com. v. Spencer, 6 Pa. Super. 256; Rex v. Roberts, 1 Campb. 399. Cuando se imputa el delito de conspiración por defraudar a un condado sometiéndole cuentas falsas, se resolvió que era admisible introducir otras cuentas falsas presentadas al llevar a cabo otras conspiraciones, cuando éstas trataban de probar el delito de conspiración imputado. McDonald v. Peo. 126 Ill. 150, 18 N E 817, 9 Am S R 547."

[12] Los testigos Nereo Pierazzi y Josefina Pierazzi, padre e hija, respectivamente, declararon acerca del aspecto de enfermo que presentaba Julio F. Rivera, diciendo que era el tipo de un hombre tuberculoso. Rivera era inquilino de Nereo Pierazzi y vivía cerca de este último. Josefina le visitaba y pudo observar los signos físicos progresivos que ciertamente denunciaban la enfermedad que padecía Rivera. Ella habla de su aspecto pálido y delgado y de sus encogidos hombres. Nereo Pierazzi vió pocas veces a Rivera, pero fueron bastantes para que quedara impreso en su mente el aspecto de enfermo de Rivera. El declaró que había visto morir a un socio, a un sobrino y dos inquilinos

de la misma enfermedad. El llegó a alarmarse y pidió a los fiadores que Rivera desalojara la casa por la clase de enfermedad que padecía y que perjudicaba a su casa por el miedo que se tenía a los tuberculosos. La contención de los apelantes oponiéndose a este interrogatorio se basaba en que era necesario demostrar la capacidad pericial de los testigos para hacer tales manifestaciones.

Desde Hipócrates, ya la tuberculosis pulmonar se estudiaba y se describía en sus obras. Su generalización en la humanidad ha sido tal, por la falta de remedios específicos, que los signos físicos de la enfermedad son familiares a personas profanas. De esto no vamos a decir que los conocimientos basados en la experiencia sean un dictamen pericial para el juez sentenciador, pero son datos o circunstancias que eran para ser apreciados por la corte en relación con los demás elementos de prueba.

[13] Se imputa a la corte inferior que erró al apreciar la prueba.

La prueba de cargo tendió a establecer que Julio F. Rivera hizo una solicitud en mayo 2, 1923, a "The Manufacturers' Life Insurance Company," solicitando un seguro de vida por $15,000 sobre una póliza ordinaria de vida. En la solicitud se hacía constar, entre otras condiciones, las siguientes: "Por la presente declaro y convengo, que me hallo actual y generalmente gozando de perfecta salud;" Del documento aparecían ser beneficiarios Juan J. Gerardino por $9,000 y Sixto Luccioni por $6,000, quienes la firmaron anteponiendo a sus firmas estas palabras: "Confirmo las respuestas, declaraciones, y convenios que anteceden." Se cursó la petición y la compañía aseguradora expidió en mayo 18, 1923, la póliza No. 286206, pagándose la prima de $475.50 anual en un cheque por Juan J. Gerardino.

La póliza, sin embargo, fué cancelada en noviembre 12, 1923, fecha en que ya había fallecido el asegurado, mediante una nota de descargo que aparece al dorso de la misma y la cual dice así:

"Ponce, P. R., Noviembre 12th de 1923.—Por la presente, los abajo firmados, relevamos de toda responsabilidad a The Manufacturers' Life Insurance Company, sobre la Póliza No. 286206 la que entregamos cancelada en este acto, expedida por dicha Compañía el día 18 de Mayo de 1923, sobre la vida de Julio F. Rivera, fenecido, en consideración a la devolución por dicha Compañía de la suma de cuatrocientos setenticinco 50/100 dollars ($475.50) que representa el importe del premio pagado a la susodicha Compañía sobre la mencionada póliza. Hacemos esta transacción por la razón de que el citado Julio F. Rivera, no estaba en buen estado de salud cuando llevó a cabo de solicitud para el seguro en dicha Compañía, y que dicha Compañía estaría justificada al rehusar el pago del importe de la mencionada póliza de seguro.

"Yo recibo tres quintas partes del premio ascendentes a $285.30.
(fdo.)    J. J. Gerardino,
Beneficiario.

(fdo.)    Eliseo Font, Jr.,
Testigo.

"Yo recibo dos quintas partes del premio ascendentes a $190.20.
(fdo.)    Sixto Luccioni,
Beneficiario.

(fdo.)    Eliseo Font, Jr.,
Testigo."

Además de este descargo en que se admite por los acusados la falsedad de sus afirmaciones del escrito solicitando el seguro en cuanto a que el asegurado gozaba de perfecta salud al tiempo de solicitarlo, el acusado Juan J. Gerardino admitió en sus diferentes conversaciones con el gerente de la compañía, William E. Young, que era cierto que Julio F. Rivera estaba enfermo en mayo 2, 1923, y que padecía de tuberculosis pulmonar. Refiriéndose el testigo a otras pólizas que entraban en el plan general de confabulación y fraude a la compañía aseguradora, el testigo, mostrándole el fiscal otra póliza sobre la vida de Rivera por $18,000, dice:

"R.—El documento es una declaración de beneficiarios en una póliza de seguro, la póliza número 289935, sobre la vida de Julio F.

Rivera. P.—¿Quién es el beneficiario en ese documento? R.—El hermano Rafael Rivera, de Ponce, Puerto Rico. . . . R.—El hermano de la persona que firmó el documento. Fiscal: P.—En las conversaciones que usted tuvo con Gerardino, ¿qué le dijo el acusado Gerardino en relación con esta póliza de diez y ocho mil dólares? R.—Él incluyó esta póliza en las otras que él había ilegalmente obtenido sobre la vida de ciertos individuos. P.—¿Y qué dijo él con referencia a ésta? R.—Que él obtendría que se liberara la póliza por la persona competente para dar la liberación . . . P.—¿Qué otras pólizas admitió el acusado Gerardino que él tenía interés en ellas y en las cuales él dijo que los asegurados estaban tuberculosos en la fecha en que se expidieron esas pólizas? . . . P.—Y en las cuales él estuviera interesado. R.—Hubo dos pólizas sobre la vida de un individuo llamado Arcadio Robles. . . R.—Según yo mejor recuerdo, una era por 17,500 dólares y la otra por mil dólares. . . R.—El señor Gerardino me dijo directamente que con relación a la póliza de 17,500 dólares sobre la vida de Arcadio Robles, él y otros individuos recibirían el beneficio completo de la póliza en caso de la muerte de Arcadio Robles. Fiscal: P.—¿Quién dijo eso? ¿quién recibiría el beneficio? R.—Que él, Juan J. Gerardino y otros individuos, Enrique Valedón Maldonado, recibirían el beneficio completo de esa póliza en caso de muerte de Arcadio Robles. Había dos pólizas sobre la vida de Armando Minucci por un total de cuarenta mil dólares y otra de quince mil dólares. En este caso el señor Gerardino me dijo directamente que él y el hermano de Armando Minucci habían mancomunadamente procurado cuarenta mil pesos en seguros en la Sun Life Insurance Co. que había de ser dividida entre Juan J. Gerardino y Armando Minucci, pero que él, Juan J. Gerardino, solamente había obtenido los cuarenta mil dólares sobre la vida de Armando Minucci en la Manufacturers' Life Insurance Co. Yo pedí al señor Gerardino una explicación de una solicitud de diez mil dólares adicionales sobre la vida de Armando Minucci fechada en esos días o no más de diez días de la fecha en que nosotros tuvimos nuestra conversación y él me admitió . . . P.—¿Quién admitió? R.—Juan J. Gerardino me admitió que esa póliza de diez mil pesos, conjuntamente con una tercera suma de cuarenta mil dólares solicitada en la Jefferson Standard Life Insurance Co. era para él solo, sobre la vida de Armando Minucci; yo le pedí una explicación de esta solicitud de diez mil pesos, porque yo había visitado y había visto a Armando Minucci en cama enfermo y le pregunté por qué ellos se proponían asegurarlo; el señor Gerardino

me admitió que toda la transacción de obtener ciento treinta mil pesos sobre la vida de este joven infortunado, era fraudulenta y era una conspiración en la cual él había entrado con su hermano, esto es, el hermano de Armando Domeneche, nombrado Buenaventura Domeneche y fué hecha con el propósito de defraudar a la compañía de·seguro de vida; él me informó que llamaría a Armando Domeneche a Ponce y que si nosotros no reportábamos estos casos al Attorney General, él haría que todas estas pólizas se cancelaran y se entregasen a la compañía; me pidió que no divulgase al infortunado Armando Domeneche el hecho de que su vida había sido asegurada por una cantidad tan grande de dinero, porque ellos habían obtenido el consentimiento de Armando Domeneche por medio de tretas y engaños. Yo consulté con nuestro abogado, el señor Poventud, y él me aconsejó . . .''

Todas estas pólizas que se han relacionado prueban evidentemente el vasto plan de la conspiración para defraudar a la compañía aseguradora.

Existe, además, prueba independiente a las admisiones de Gerardino de que Julio F. Rivera padecía de tuberculosis en la fecha de solicitar el seguro de vida. El Dr. Montalvo Guenard afirmó que Julio F. Rivera clínicamente tenía el aspecto general de un tuberculoso. No refiere la fecha exacta de este conocimiento de Rivera, pero dice que sería allá para mediados de 1923. El Dr. Oms si bien habló de que Rivera tenía una bronco-neumonía y que de eso murió, no negaba ni afirmaba, sin embargo, que pudo padecer de tuberculosis pulmonar. Se puede notar la tendencia evasiva en estas declaraciones no sentando conclusiones categóricas, pero todo ello demuestra el esfuerzo extraordinario que se hacía intentando dejar en la penumbra la falsedad del hecho esencial que servía de base a los conspiradores, demostrativa de su intención engañosa y fraudulenta, como lo era hacer pasar a Rivera gozando de perfecta salud cuando en realidad era un verdadero enfermo. Las declaraciones de los testigos Pierazzi y de las cuales hemos hecho mención, se refieren a hechos observados en los meses de marzo o abril de 1923, o sea, poco antes de solicitarse

el seguro por el asegurado y los beneficiarios. No aparece en consecuencia ningún interés asegurable en la póliza ordinaria de vida de Julio F. Rivera por $15,000 a favor de los acusados. Aunque Gerardino trató -de establecer que hizo un préstamo por $3,000 a Rivera y la póliza le aseguraba una garantía colateral, el descargo mismo de la póliza evidencia que fué un acto de mera apariencia como parte de la urdimbre tejida por los acusados para envolver en sus redes a la compañía aseguradora y defraudarla.

La prueba de descargo trató de demostrar que Julio F. Rivera a la fecha del seguro estaba en perfectas condiciones de salud y que en virtud de un préstamo por $3,000 que necesitó el asegurado de Gerardino, éste fué el beneficiario para garantizar la operación. La contradicción de esta prueba con la de cargo fué dirimida por el juez sentenciador en contra de los acusados y a nuestro juicio no existe nada que demuestre que hubo error o que el juez fuera movido por pasión, prejuicio o parcialidad en su apreciación.

El acusado Luccioni insiste que él no tomó participación en los hechos engañosos y toda la responsabilidad la descarga en su coautor Gerardino. imputándole que fué el principio, medio y fin de la conspiración. Sin embargo, Luccioni firmó voluntariamente la solicitud de seguro en donde él afirmaba la buena salud del asegurado, apareciendo como beneficiario por $6,000. El entró desde entonces en el acuerdo o plan con el otro acusado para conspirar y defraudar, certificando un hecho fraudulento y falso refiriéndose al perfecto estado de salud del asegurado. Luego recibió la parte de la prima por el descargo o cancelación de la póliza, aceptando que Julio F. Rivera no estaba en buena salud al solicitarse el seguro.

[14] También se quejan los apelantes que la corte abusó de su discreción al dictar sentencia dos meses después de celebrada la vista. Pero la cuestión es demasiado tardía, pues se levanta por primera vez en apelación. *El Pueblo v. Cardona,* 36 D.P.R. 621.

[15] Se alega por último que la corte erró al dictarse sentencia por no haberse probado fuera de duda que el delito se cometió dentro de la jurisdicción territorial de Ponce.

La prueba en conjunto demuestra que los hechos ocurrieron en la ciudad de Ponce, en donde vivían el asegurado y los beneficiarios. La jurisdicción quedó plenamente probada.

*Por todo lo expuesto debe confirmarse la sentencia apelada.*