EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PEDRO RAMÍREZ, acusado y apelante.

Núm. 5877.—*Sometido:* Mayo 19, 1936. *Resuelto:* Junio 26, 1936.

*Juan B. García Méndez,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

El Juez Asociado Señor Travieso, emitió la opinión del tribunal.

El apelante fué acusado ante la Corte de Distrito de Mayagüez de haber dado muerte un día del mes de mayo de 1934 a Rafael Vives Nazario, bajo circunstancias que el fiscal consideró suficientes para calificar el hecho como un delito de asesinato en primer grado. Se alega en la acusación que el acusado hizo a su víctima varios disparos de revólver, infiriéndole una herida de bala en la espalda, como consecuencia directa de la cual falleció inmediatamente.

. La acusación le fué leída al acusado el 28 de mayo de 1934, se le concedió hasta el 1 de junio de 1934 para contestarla, y en esa fecha hizo la alegación de no culpable y solicitó juicio por jurado.

En julio 3 de 1934, compareció el acusado por su nuevo abogado, Lic. Manuel A. García Méndez, y presentó una moción pidiendo que se hiciese más específica la acusación en cuanto al número de heridas de bala recibidas por el interfecto, sitio en que fueron inferidas y trayectorias de las mismas y número de disparos que se alega fueron hechos por el acusado. El día 6 del mismo mes dicha moción fué declarada sin lugar, y el día 19 el acusado consignó su excepción.

En 20 de julio de 1934, el acusado, por representación del abogado J. B. García Méndez, quien alegó actuaba en representación del licenciado Manuel A. García Méndez, abogado del acusado, solicitó la suspensión de la vista del caso, que estaba señalada para el 23 de julio de 1934, alegando:

1. Que el Lic. Manuel A. García Méndez, abogado defensor del acusado, se vió obligado a ausentarse de la isla por motivos de salud, por prescripción de su médico, quien así lo certificó; y que no regresará hasta el mes de septiembre o primera decena de octubre de 1934.

2. Que en la fecha en que se ausentó el referido abogado, el caso no había sido señalado para juicio, y que dicho abogado tenía los siguientes motivos para creer que el caso no sería señalado hasta pasado el mes de septiembre: (a) porque el mes de julio

no se dedica ordinariamente por la Corte de Distrito de Mayagüez a la vista de casos ante jurado; (*b*) porque agosto y septiembre son los meses de vacaciones de dicho tribunal; (*c*) porque por haber transcurrido tan poco tiempo desde la comisión del alegado delito y haberse radicado muchos otros casos con anterioridad al de autos, creyeron los abogados que este caso sería llamado por su orden en el registro y no sería señalado para el mes de julio.

3. Que tratándose de un caso de asesinato, no le sería posible al acusado proveerse de otro abogado que pudiera defenderle debidamente, por no disponer de tiempo suficiente para preparar su defensa, quedando así el acusado en estado de indefensa.

4. Que el único abogado del acusado era el Lic. Manuel A. García Méndez, y que el abogado J. B. García Méndez, firmante de la moción, no conocía los hechos del caso, ni las cuestiones de derecho que había que plantear; que este último abogado se ha dedicado a la defensa de asuntos civiles solamente, careciendo de práctica en asuntos criminales, mientras que el otro se ha especializado en esa práctica.

Como anexos a la moción se presentaron una certificación médica y un *affidavit* de méritos suscrito por el acusado.

En 21 de julio de 1934 la corte ordenó la suspensión de la vista y la señaló de nuevo para el día 7 de agosto de 1934, ordenando al mismo tiempo al secretario de la corte que publicase los avisos correspondientes, para anunciar la celebración de un término especial que habría de comenzar el citado día 7 de agosto de 1934.

El 31 de julio de 1934, el acusado, por conducto de su abogado Lic. J. B. García Méndez, solicitó de la corte de distrito una orden para que se procediese a practicar el sorteo y la citación de los jurados que habrían de conocer de la causa, de acuerdo con lo prescrito por la Regla 6 de la corte, que dice:

"Regla 6.—Tan pronto como se haya dictado la orden señalando día para los juicios por jurado, la Corte ordenará que se escojan y citen jurados en la forma que prescribe la ley de procedimiento criminal, para que comparezcan como tales jurados a las 9 A. M. del día señalado para juicio de las causas de dicho registro."

El día 7 de agosto de 1934 la corte, después de oír a ambas partes, declaró sin lugar la moción sobre sorteo y citación del jurado.

En la vista del caso, durante los días 8, 9 y 10 de agosto de 1934, el acusado estuvo representado por los abogados Rafael Martínez Nadal, Juan B. García Méndez y Amador Ramírez Silva.

Al serle leída la acusación al acusado, éste, por medio de sus abogados, ratificó su alegación de inocencia, y acto seguido se procedió al sorteo del jurado y a la celebración del juicio.

El día 10 de agosto de 1934, el jurado rindió un veredicto declarando al acusado culpable de asesinato en segundo grado. El 20 de septiembre de 1934, el acusado presentó moción para que se le concediese un nuevo juicio, la que fué declarada sin lugar por resolución dictada en 12 de diciembre de 1934. El día 19 del mismo mes y año, la corte dictó sentencia condenando al acusado a la pena de doce años de presidio con trabajos forzados. En la misma fecha el acusado apeló para ante esta Corte Suprema de la negativa del nuevo juicio y de la sentencia condenatoria.

Se basa el presente recurso en la alegada comisión por la corte inferior de catorce distintos errores, cada uno de los cuales es, según contiende el apelante, de suficiente importancia para justificar la revocación de sentencia que se solicita.

Procederemos ahora a examinar y resolver los alegados catorce errores, siguiendo el mismo orden en que aparecen expuestos en el alegato del apelante.

1º. y 2º.—Que la corte inferior erró y abusó de su discreción al denegar la solicitud del acusado para una mayor especificación de particulares de la acusación; y que erró también al proceder a resolver dicha solicitud sin oír al acusado y con la sola audiencia del Fiscal.

La acusación formulada en este caso alega que el acusado:

" . . . . acometió y agredió haciendo diferentes disparos con un

revólver cargado con pólvora y balas, que es un arma mortífera, al ser humano Rafael Vives Nazario, conocido por el Gallego, infiriéndole una herida de bala en la espalda a nivel de la décima costilla penetrando por la pleura, donde causó hemorragia profusa, perforó el lóbulo inferior del pulmón, atravesó el diafragma desgarrando el polo superior 'del bazo y curvadura grande del estómago y penetrando de nuevo en el tórax atravesó el pericardio, ventrículo derecho del corazón, tejido areolar del mediastino anterior y esternón, .alojándose bajo la piel y a consecuencia directa de dicha herida falleció el citado Rafael Vives Nazario inmediatamente.''

Se queja el apelante de que la corte inferior se negara a ordenar al fiscal que especificase en la acusación cuántas heridas de bala recibió el interfecto, sitio y trayectoria de las mismas, y además el número de disparos que se dice fueron hechos por el acusado.

Para poder resolver si el alegado error, en caso de que éste se hubiere cometido, es de tal naturaleza e importancia que debemos considerarlo como perjudicial a los derechos sustanciales del acusado, examinaremos primero la suficiencia de la acusación en la forma en que fué presentada, y veremos después si las especificaciones solicitadas eran realmente necesarias para una adecuada defensa del acusado.

Nuestro Código de Enjuiciamiento Criminal (ed. de 1935) dispone:

''Artículo 82.—La acusación es suficiente, si de ella se deduce:
'' .

''6. Que la acción u omisión considerada como delito está expuesta clara y distintamente en lenguaje corriente y conciso, sin repetición y de tal modo que facilite a cualquier persona de inteligencia común, conocer lo que se quiere decir.

''7. Que la acción u omisión considerada como delito esté expresada con tal grado de claridad, que facilite al tribunal el pronunciar su sentencia como resultado de una convicción y conforme a derecho.''

''Artículo 83.—Ninguna acusación es insuficiente, ni puede el juicio u otro procedimiento cualquiera que sobre ella se base ser afectado a causa de algún defecto o imperfección de forma, siempre que tal defecto o imperfección de forma no tienda en lo esencial a perjudicar los derechos del acusado.''

Examinada a la luz de las disposiciones legales que preceden, la acusación en el caso de autos es suficiente y completa. En lenguaje corriente y sencillo informa al acusado que el delito que se le imputa es el de haber acometido y agredido al ser humano Rafael Vives Nazario, con un revólver; y de una manera ilegal y voluntaria, con malicia premeditada y con el firme y deliberado propósito de causarle la muerte, haberle hecho varios disparos con balas, una de las cuales le infirió una herida de tal naturaleza y gravedad que le produjo la muerte inmediatamente. No estaba obligado el fiscal a describir tan minuciosamente como lo hizo la herida que causó la muerte de Rafael Vives Nazario. Veamos la jurisprudencia:

"Aun cuando en el derecho común gran minuciosidad en la descripción de la herida se considera esencial, siempre que fuere posible, y su longitud, anchura y profundidad, si fuere incisa, debe hacerse constar, bajo los modernos estatutos de procedimiento criminal tal minuciosidad es innecesaria. Y en algunas jurisdicciones no se requiere descripción alguna de la herida. Así es que como regla general ahora no es esencial hacer constar su longitud, anchura, y profundidad, toda vez que puede ser rechazada como innecesaria (*surplusage*) y una incongruencia en la descripción de la herida no es fatal . . .

"En todas las acusaciones en que se alega que la muerte resultó de un ataque o golpe, debe alegarse que la herida infligida por el golpe fué mortal y que de ella resultó la muerte. No es necesario demostrar que la herida era de tal carácter que probablemente habría de ocasionar la muerte, pero es suficiente si se alega que la herida era mortal y que causó la muerte del interfecto. Aun cuando el término 'mortal' ha sido considerado como indispensable, se ha sostenido por otro lado que basta alegar que el interfecto murió como consecuencia de la herida que le fué inferida, y que el uso de la palabra 'mortal' no es imperativo. C. J. párrfs. 293 y 294, vol. 30, p. 105.

"De acuerdo con la regla estricta del derecho común es esencial que en la acusación se diga sobre qué parte del cuerpo se infirió la herida que causó la muerte, siendo fatal cualquiera incongruencia, pero esa particularidad no es ya esencial en la mayoría de las juris-

dicciones, habiéndose sostenido en muchos casos que es suficiente alegar que fué 'sobre el cuerpo.' '' C. J. párr. 295, vol. 30, p. 105.

En el caso de *People* v. *Steventon,* 9 Cal. 274, el acusado presentó excepción perentoria, en la que alegaba que la acusación era insuficiente porque no expresaba las partes del cuerpo en donde se habían inferido las heridas. La corte, al sostener la suficiencia de la acusación, dijo:

"La objeción de que la acusación no expresa la longitud y profundidad de la herida, ni la parte del cuerpo en que fué inferida, se refiere más a la forma que al fondo de la acusación. Antiguamente, en el derecho común, tal descripción era considerada como necesaria, aun cuando no era necesario que fuera probada, en la forma alegada, pero en los casos más recientes esta regla ha sido cambiada . . .

"Los 'hechos necesarios para constituir el delito' de asesinato son, que una herida ha sido inferida con intención criminal, que esa herida es mortal, y que la muerte fué causada como consecuencia de dicha herida dentro del término de un año y un día después de haber sido infligida."

La misma cuestión fué levantada ante la Corte Suprema de California en *People* v. *King,* 27 Cal. 507, y dicha corte se expresó así:

"Bajo el pretexto de informar al acusado sobre la naturaleza del cargo contra el cual se le llama a defenderse, era necesario, en el antiguo derecho común, describir los medios empleados para la comisión del homicidio, y la naturaleza y extensión de la herida y el sitio preciso de la misma; de lo que resultaba necesariamente que la más insignificante incongruencia entre la prueba y la alegación con frecuencia echaba abajo una convicción, no importa cuán manifiesta estuviere la culpabilidad del acusado. Transcurrió mucho tiempo antes de que los legisladores y jueces descubriesen que esta regla está apoyada solamente por el más vano pretexto. Si el acusado es culpable, no tiene necesidad de los informes que pueda obtener de un examen de la acusación, en cuanto a los medios usados por él para cometer el acto o en cuanto a la manera en que el hecho fué realizado, porque en cuanto a ambas cosas su propio conocimiento es tan digno de crédito como cualquiera manifestación contenida en

la acusación. Si él no es culpable, tales informes no podrían ayudarle en la preparación de su defensa . . .

"La acusación no es insuficiente porque no alega que John Duffy era un ser humano, ni que tenía un cuerpo, ni la parte del cuerpo sobre la cual se infirió la herida."

Véanse: *People* v. *Cronin,* 34 Cal. 191; *People* v. *Hong Ah Duck,* 61 Cal. 387.

La concesión de una especificación de particulares (*bill of particulars*) en un caso criminal no es un derecho absoluto del acusado. Depende de la sana discreción de la corte ante la cual ha de celebrarse el juicio. No existe en nuestro derecho procesal disposición alguna que obligue a la corte a ordenar al fiscal que presente al acusado un pliego de especificaciones; pero la corte puede, en uso de su discreción, dictar esa orden, pues la facultad para así hacerlo no depende de una autorización estatutaria expresa, sino que está incluída dentro de la facultad general que tienen los tribunales para regular la tramitación de los juicios y el debido cumplimiento de la ley. Tratándose de una facultad discrecional de la corte, la resolución de ésta no es revocable a menos que las circunstancias del caso demuestren claramente que la corte abusó de su discreción y que la falta de la especificación de particulares impidió al acusado preparar debidamente su defensa.

Esta Corte Suprema tuvo bajo su consideración el caso de *El Pueblo* v. *Piñero,* 31 D.P.R. 1, en el que el acusado presentó una petición jurada para que el fiscal le suministrara una especificación de particulares. Se imputaba al acusado, motorista de un carro eléctrico, "que en ocasión en que guiaba el carro de una manera ilegal y voluntaria, y por no usar la debida prudencia y circunspección, arrolló a un niño causándole la muerte. La corte inferior desestimó la petición. Esta corte revocó la sentencia, diciendo:

"Alega el apelante que si bien ésa es la regla general cuando la definición de un delito emplea términos genéricos, como en este caso en que la falta de debida prudencia y circunspección ha podido ser debida a distintos actos u omisiones, la acusación debe ser más espe-

cífica y relacionar los actos u omisiones que la han producido para que el acusado pueda preparar su defensa. Igual cuestión fué propuesta en el caso de *El Pueblo* v. *Parkhurst,* 29 D.P.R. 922, y entonces dijimos con una acusación análoga a la presente que el defecto, de serlo, era de forma y que podría subsanarse con un pliego de particulares (*bill of particulars*) y citamos los casos de *Smith* v. *State,* 115 N. E. (Ind.) 943; *Reams* v. *State,* 100 S. E. (Ga.) 230, y de *State* v. *Sartino,* 115 S. W. (Mo.) 1015. También hicimos referencia al caso de *El Pueblo* v. *Moreno,* 28 D.P.R. 104, cuya acusación es idéntica a la de este caso y habiéndose alegado que en ella no se expusieron los hechos constitutivos de un delito público por no haber sido especificados los actos de negligencia o descuido declaramos que cuando se imputa negligencia en términos generales y se alegan las circunstancias bajo las cuales dicha negligencia tiene lugar, el hecho de no especificar la naturaleza particular de la negligencia de ser un defecto lo es de forma y que el acusado hubiera tenido derecho a una especificación de particulares si lo hubiera pedido. En los casos de *Coffin* v. *United States,* 156 U. S. 452; *Rosen* v. *United States,* 161 U. S. 34; *Dunlap* v. *United States,* 165 U. S. 490, y *Kirby* v. *United States,* 174 U. S. 64, se dice que cuando se desean conocer hechos para preparar la defensa debe hacerse una moción en tal sentido (*bill of particulars*) a la corte antes del juicio; y en las notas al caso de *State* v. *Lewis,* Am. Ann. Cas. 1913 A, página 1203, se trata extensamente esta cuestión con citas de sentencias según las cuales el derecho a una especificación de particulares no es absoluto sino discrecional en la corte y que sólo cuando haya abuso de tal discreción será revocada la negativa a conceder la petición.

"En este caso el acusado pidió una especificación de particulares y se le negó. El acusado, como fundamento de su petición, se limitó a decir que no podía preparar su defensa sin enterarse de los hechos, los actos u omisiones que se califican de ilegales o constitutivos de falta de debida prudencia y circunspección. Debió ser más explícito para convencer a la corte de que le sería imposible o difícil preparar su defensa, por lo que se nos hace difícil declarar que al negar tal moción la corte abusó de su poder discrecional para concederla, pero como el examen que hemos hecho de la prueba nos demuestra que en verdad el hecho imputado pudo ocurrir de muchas maneras pues por las declaraciones de unos testigos el acusado llevaba el carro eléctrico a una gran velocidad; según otros no tocaba la campana de aviso; se declaró también que no miraba para la vía férrea por estar distraído mirando a unas jóvenes que pasaban por la acera de-

recha de la calle. Todo esto nos convence de que en bien de la justicia y bajo el poder general que tenemos debe revocarse la sentencia apelada a fin de que sea concedida la moción que hizo sobre especificación de hechos (*bill of particulars*).''

· Véanse: *El Pueblo* v. *Pacheco*, 33 D.P.R. 224–227; *El Pueblo* v. *Gerardino*, 37 D.P.R. 185–190, y *El Pueblo* v. *Colón*, 37 D.P.R. 241.

·· La acusación en el presente caso se ajusta al estatuto. Contiene todos los elementos constitutivos de un delito de asesinato en primer grado, y seguramente una excepción perentoria atacando su suficiencia no hubiera prosperado.

. El fiscal, sin estar obligado a ello, dió al acusado amplios detalles y particulares sobre la herida que, según se alegaba en la misma acusación, produjo la muerte de Rafael Vives ·Nazario. · No vemos en qué ha podido perjudicar al acusado ;el que no se le haya dado antes de la vista del caso una descripción más o menos detallada de otras heridas que hubiera ·recibido el interfecto y que no habían sido la causa directa .de su muerte; o el que no se le informase previamente del · ·número de disparos que se alegaba habían sido hechos por él. Si el acusado no era culpable de la muerte de Vives, la prueba de su inocencia no podía depender en manera alguna del mayor o menor número de las heridas o del sitio o trayectoria de las mismas o del número de disparos hechos por el acusado en contra de su víctima. Y si era culpable, como lo ha declarado el jurado, él mejor que nadie debía saber cuántos disparos hizo y cuántos· de ellos hicieron blanco en el cuerpo del occiso.

Hemos examinado detenidamente la declaración del único perito médico que declaró sobre las heridas que presentaba el cuerpo del occiso. Según esa declaración, éste presentaba tres heridas de bala y una erosión. Dos de las heridas, la de la región epigástrica y la del antebrazo derecho, no revestían gravedad alguna; y apenas si se les dió importancia en la repregunta del perito médico por la representación de la defensa. La otra herida, la causante de la muerte de Vives,·

fué descrita con particularidad extrema en la acusación. Y la prueba pericial en cuanto a ella fué perfectamente congruente con las alegaciones de la acusación.

La teoría de la defensa—la defensa propia—no estaba basada en manera alguna en el número de las heridas, ni en el sitio o trayectoria de las mismas. La prueba pericial sobre las heridas se desarrolló sin incidente alguno, sin que el acusado alegase sorpresa y sin que sus abogados hiciesen esfuerzo alguno para oponerse a la admisión de prueba referente a heridas no descritas en la acusación. Y en toda la transcripción de la evidencia no aparece que se estableciera durante el juicio cuestión alguna con referencia al número y naturaleza de las heridas.

El examen detenido de todos los hechos y circunstancias del caso nos lleva a la conclusión de que la corte inferior no cometió error alguno ni abusó de su discreción al negar la especificación de particulares solicitada.

■ Se queja la representación del acusado apelante de que la corte sentenciadora decidiese la moción sin oír al acusado. De los autos no aparecen las razones que tuviera la corte para resolver la cuestión sin oír al promovente. Pudiera ser que la corte se negase a considerar la solicitud por el hecho de no estar ésta jurada, de acuerdo con la práctica establecida para esa clase de mociones, o por considerar que la moción era frívola o presentada con propósitos dilatorios. De todos modos, aun cuando esta corte no desea alentar ni sancionar la práctica de resolver las mociones, sin oír a una y otra de las partes interesadas, creemos que en el presente caso los derechos esenciales del acusado no han sido afectados por la resolución de la corte inferior.

Los errores 1º. y 2º. carecen de fundamentos y deben ser desestimados.

■ 3º.—Que la corte sentenciadora cometió error al negar la moción del acusado en que solicitaba de la corte que procediese a la insaculación de los jurados que habían de conocer de la causa.

Alega el apelante que la moción fué presentada el 31 de julio de 1934; que el día 7 de agosto de 1934, que era el señalado para la vista del caso, la corte procedió a insacular el jurado y pospuso la vista hasta el día siguiente 8 de agosto. Y arguye que la corte cometió error al no proceder a insacular el jurado tan pronto como se dictó la orden de 22 de julio de 1934, fecha en que se señaló la vista del caso para el día 7 de agosto, según lo prescrito por la Regla 6, supra.

Ni en la transcripción de autos ni en la de la evidencia, que son todos los documentos que constituyen el legajo de esta apelación, aparecen las fechas en que se hicieron la insaculación y sorteo y la citación del *panel* para la selección del jurado que había de conocer de esta causa. En el acta del juicio se hace constar:

"Recuérdese que durante los días 8, 9 y 10 de agosto de 1934, previo señalamiento en el calendario de asuntos criminales de esta Corte, presidida la misma por su Juez Hon. Charles E. Foote, tuvo lugar la vista de este caso *ante un jurado que fué debidamente seleccionado y juramentado de acuerdo con la ley,* el cual quedó formado por los siguientes señores:"

Hemos examinado cuidadosamente el récord del caso y no hemos encontrado constancia alguna de que el acusado hiciera una recusación de la totalidad del *panel* por no haber sido insaculado, sorteado y citado de acuerdo con lo dispuesto por la citada Regla 6 de la corte. En el acta del juicio aparece que después de haberle sido leída la acusación al acusado, de haber éste ratificado su alegación de inocencia y de haber sido juramentados los testigos de ambas partes, se procedió a la insaculación del jurado, conviniendo las partes que el taquígrafo no tomaría notas del examen del jurado a menos que durante el curso del mismo surgiese algún incidente. Y entre los incidentes que aparecen descritos en la transcripción de la evidencia, no hay uno solo que se refiera a o tenga relación con la fecha o manera en que se hiciera la insaculación y citación del *panel* de jurados.

Nuestro Código de Enjuiciamiento Criminal (ed. 1935) provee:

"Artículo 211.—Recusar el *panel* es la objeción puesta a todos los jurados que figuran en la lista presentada, y cualquiera de las dos partes puede ejercitar este derecho.

"Artículo 212.—Sólo puede fundarse la recusación de todo el jurado en que los procedimientos se hayan desviado considerablemente de las prácticas prescritas para el sorteo y formación de la lista de jurados, o en que se haya omitido citar intencionalmente a uno o más de los jurados sorteados.

"Artículo 213.—La recusación de todo el jurado ha de hacerse antes de que a ningún miembro del mismo se le tome el juramento de su cargo, y podrá presentarse por escrito, o consignarla en autos el secretario, y exponiéndose en ella clara y distintamente, los hechos que constituyen los fundamentos de la recusación."

No aparece constancia alguna en los autos que indique que el acusado apelante hiciera uso del derecho que le concede el artículo 211, supra, para recusar el *panel* por haberse desviado la corte de la práctica prescrita para su sorteo y citación. Y estando el acusado representado por hábiles abogados, conocedores de las disposiciones legales transcritas, debemos llegar a la conclusión de que el acusado renunció su derecho de recusación y aceptó el *panel* como legalmente constituído. Véanse: *El Pueblo* v. *Vázquez*, 20 D.P.R. 365; párr. 245, 35 C. J. 279.

No existe, por lo tanto, el error imputado al tribunal inferior.

■ 4º.—Que la corte inferior cometió error al no permitir a los abogados del acusado repreguntar al testigo de cargo Gustavo Ramírez de Arellano.

Aparece de la transcripción de la evidencia, que el señor Gustavo Ramírez de Arellano compareció en el acto de la vista del caso, como testigo de la acusación, y que a preguntas directas del fiscal declaró solamente que residía en San Germán; que conocía al acusado; que conocía a doña Camila Ramírez de Arellano, quien es su prima hermana;

que conoció a Rafael Vives Nazario; y que allá para el día 19 de mayo de 1934 estuvo en casa de doña Camila Ramírez, pues ésta lo mandó a buscar a ver si él podía evitar el matrimonio de su hija con Rafael Vives Nazario.

Terminado el examen directo de dicho testigo, éste, a repreguntas de la defensa, contestó que no sabía si además de él se había citado a alguna otra persona para discutir lo relativo al matrimonio de la hija de doña Camila con Vives; que él estuvo ese día en casa de doña Camila. Y entonces tuvo lugar el siguiente diálogo:

Defensor: Se discutió allí el asunto, qué motivos . . .

Fiscal: Nos oponemos. El Fiscal no ha preguntado sobre si se discutió o no.

D.: Pero nosotros podemos discutir la cuestión. En todo no, pero en relación con lo que hizo allí el testigo.

F.: El Fiscal no le preguntó sino para qué fué llamado él allí.

La corte sostuvo la objeción del fiscal y la defensa anotó su excepción. Alega la defensa, que la resolución de la corte es errónea ''porque favorece al fiscal tratando de evitar que un testigo presencial de los hechos sea examinado por la defensa.''

Somos de opinión que la corte inferior no incurrió en error alguno cuando sostuvo la oposición del fiscal a las preguntas de la defensa sobre materias que no habían sido cubiertas por el examen directo del testigo.

Nuestro Código de Enjuiciamiento Civil (ed. de 1933) (Ley de Evidencia, artículo 155) dispone:

''Artículo 517.—La parte contraria podrá repreguntar al testigo respecto a cualesquiera hechos mencionados en el interrogatorio directo, o relacionados con los mismos.''

Y la jurisprudencia de esta Corte Suprema, en el caso de *El Pueblo* v. *Fernández,* 14 D.P.R. 629, sostiene:

''Aplicando la conocida máxima de interpretación *expressio unius est exclusio alterius* es evidente que las preguntas deberán limitarse a los hechos establecidos en el examen directo. Esto impide que se

hagan las repreguntas extensivas a hechos que se encuentran fuera de dichos límites.''

La repregunta objetada por el fiscal y no permitida por la corte claramente traspasaba los límites del examen directo. En éste, no se dijo absolutamente nada sobre lo que se hubiera discutido en la casa de doña Camila Ramírez de Arellano. Las mismas palabras del abogado defensor, al decir que la corte al sostener la objeción ''favorece al fiscal tratando de evitar que un testigo presencial de los hechos sea examinado por la defensa'', revelan que su intención era aprovechar la repregunta de un testigo, que nada había declarado en el examen directo sobre los hechos por él presenciados, para hacerle declarar sobre hechos nuevos que no habían surgido del examen directo. Ésa no es la función de la repregunta; y creemos que la corte cumplió su deber al no permitir la que se formuló en este caso.

Si el acusado tenía interés en que el testigo declarase sobre hechos que pudiesen favorecerle en su defensa, bien pudo haberle llamado para que declarase como testigo de la defensa. Parece ser que la representación del acusado tuvo la intención de hacerlo así, pues al final del diálogo arriba transcrito, el abogado defensor pidió a la corte que ordenara que el testigo quedase bajo las reglas de la corte, y así se ordenó. La defensa creyó prudente no llamarlo.

Queda desestimado este alegado error por carecer de méritos.

5°., 7°., 10°. y 11°.—Que la corte sentenciadora erró al denegar las siguientes intrucciones al jurado, propuestas por el acusado:

''5°.—La Corte os instruye que una persona está justificada en quitar la vida a otra en defensa de su hogar cuando es real o aparentemente necesario hacerlo así para repeler a otra que intente agredir a una persona que está en la casa. *Pueblo* v. *Méndez*, 40 D.P.R. 757. En el caso de que ahora se trata la Corte desea instruirles que si los señores del Jurado llegan a la conclusión de que la esposa del acusado fué insultada y que era real o aparentemente necesario

* NOTA: Véase página 281 *et seq.*

que el acusado atacara al interfecto para repeler o evitar la agresión de Rafael Vives, conocido por Gallego, entonces el acusado obró en el ejercicio del legítimo derecho de defensa propia y vosotros estáis en la obligación de absolverlo.

"7º.—El acusado ha establecido la teoría de defensa propia como eximente de responsabilidad, y es a los señores del jurado a quienes corresponde determinar si existió o no tal defensa propia en este caso. Si del análisis de la prueba el Jurado ha llegado a la conclusión de que hubo la defensa propia, o si tiene duda razonable respecto de si el acusado actuó o no en defensa propia, en ambos casos el Jurado debe traer un veredicto absolutorio, porque aun el beneficio de la duda en el ejercicio de la defensa propia debe darse al acusado. 13 California Jurisprudence, página 737, párrafo 104; *Pueblo* v. *Pacheco*, 40 D.P.R. 395.

"10º.—Una persona puede repeler la fuerza con la fuerza en la defensa de la persona, bienes o vida, contra uno que abiertamente, intenta o trata por medio de la violencia o de la sorpresa de cometer un determinado delito *misdemeanor* o *felony*, o cualquiera de ellos, o de causar un grave daño corporal a su persona, y el peligro que justificaría al acusado al cometer el acto imputádole, puede ser real o aparente, y el jurado no tiene que considerar si el acusado estaba en verdadero peligro de su vida o propiedad, sino solamente si las circunstancias eran tales que indujeran a una persona de mente sana a creer que su persona o sus bienes estaban expuestos a tal peligro, y si racionalmente podía así creerlo y tenía suficiente causa para estimarlo así, y cometió el hecho que se le imputa bajo tal creencia, aun cuando apareciera que el interfecto no estaba armado, ustedes deben absolverlo. *Pueblo* v. *Chico*, resuelto por el Tribunal Supremo de Puerto Rico en julio 19 de 1933. *El Pueblo* v. *Sutton*, tomo 17 D.P.R. 367.

"11º.—La Corte os instruye que para que el daño en que se encontraba el acusado apareciera real a dicho acusado es todo lo que requiere la ley para que dicho acusado estuviere justificado en matar en defensa propia. (*Francis* v. *State*, L.R.A. (N. S.) Vol. 3, página 541)."

Hemos leído cuidadosamente las instrucciones dadas por la corte al jurado con referencia a la defensa propia. De ellas copiamos lo que sigue:

"Una muerte dada en defensa propia es justificada, es excusada por la Ley, y no es una muerte ilegal.

"

"La defensa del acusado es la defensa propia. La persona contra quien se intente algún daño, podrá oponer la necesaria resistencia para impedir una ofensa contra su persona. El derecho a la propia defensa en ningún caso se extiende a la inflicción de más daño que el necesario al objeto.

"Para justificar una muerte en que se alegue la propia defensa, es necesario no sólo creer, sino tener fundados motivos para creer que al matar al agresor se hallaba el agredido en inmediato e inminente peligro de muerte o de sufrir grave daño personal. Las circunstancias deberán ser de tal naturaleza que lleven al ánimo de una persona de moderada prudencia el convencimiento de que el acusado se hallaba en peligro de perder su vida o de sufrir grave daño personal. Fundado temor no significa el temor de un cobarde, sino el temor de una persona de moderado valor.

"Para justificar una muerte en que se alegue la defensa propia, debe aparecer que el matador fuera razonablemente sin culpa, sin falta. Él debe creer en el tiempo en que se realizó el hecho, que estaba en tan inmediato e inminente peligro de perder su vida propia o de recibir tan grave daño personal, que él tuvo necesidad de tomar la vida de su asaltante para salvarse. Las circunstancias deben de haber sido tales, que lleven al ánimo de una persona de moderada prudencia el convencimiento de que el acusado se hallaba en peligro de muerte o de recibir grave daño personal.

"El acusado alega la defensa propia y él está en la obligación de aportar evidencia en apoyo de su alegación, pero él no está en la obligación de aportar, de introducir evidencia suficiente para convencer al Jurado que él actuaba en defensa propia fuera de duda razonable. Quiere decir, que está en la obligación de aportar evidencia, fuera de duda razonable, de que actuaba en defensa propia. Es suficiente si él introduce evidencia de la defensa propia, que considerada por los señores del Jurado en conjunto con toda la evidencia del caso, levante en la mente de los señores del Jurado una duda razonable de la culpabilidad del acusado.

"Señores del Jurado: es de toda importancia que ustedes se fijen en la situación como existía cuando el acusado hizo el disparo que hirió al interfecto y le causó la muerte; el sitio que ocupaba el acusado, el sitio que ocupaba el interfecto. Todas las circunstancias, todo lo que existía en esos momentos dados para tomarlo en consideración al resolver la cuestión de la defensa propia, pero particularmente al determinar la cuestión de si el acusado tenía razones fun-

dadas para creer en esos momentos que él se encontraba en inmediato e inminente peligro de muerte o de sufrir grave daño corporal.

"

"Si ustedes creen, señores del Jurado, que el acusado actuó en defensa propia, ustedes deben declararle no culpable."

No se queja el apelante, en los errores que discutimos, de las instrucciones dadas por la corte, sino de la negativa de ésta a darlas en la forma propuesta por el abogado del acusado.

Somos de opinión que las instrucciones dadas por la corte cubrieron plenamente y de una manera justa e imparcial la doctrina legal sobre el derecho a la legítima defensa, con perfecta adaptación a los hechos establecidos por las declaraciones de los testigos presenciales, las que examinaremos más adelante en esta opinión. Las instrucciones dadas cubrieron prácticamente todos los puntos sugeridos por la defensa en las instrucciones por ella propuestas y denegadas por la corte. Y seguramente la corte se negó a darlas por temor de confundir e impresionar indebidamente al jurado.

En la obra Ruling Case Law encontramos lo siguiente:

"22.—*Instrucciones Sobre Puntos ya Cubiertos.*—La corte debe instruir al jurado plenamente y con imparcialidad sobre la ley aplicable al caso, y tanto las partes como el jurado tienen el derecho de insistir en que la corte cumpla ese deber. Pero cuando el jurado ha sido plena y correctamente instruído en cuanto a los puntos en controversia, es impropio reiterar o repetir las instrucciones en las mismas palabras o en substancia, porque el hacerlo así tiende a desviar y confundir al jurado al dar indebido énfasis a los puntos particulares con respecto a los cuales se repiten las instrucciones. Por tanto, la corte no está obligada a dar las mismas instrucciones tantas veces como se le pida, sino que tiene discreción para denegarlas, después que han sido dadas claramente una vez. Y la regla ha sido establecida desde hace mucho tiempo, por una línea no interrumpida de autoridades judiciales, que la denegación de una instrucción solicitada, aun cuando ésta exprese la ley correctamente, no constituye causa de revocación si esa instrucción está sustancialmente cubierta por las instrucciones dadas . . ." 14 R.C.L. pág. 751.

Véanse: *El Pueblo* v. *Español,* 16 D.P.R. 229; *El Pueblo* v. *Lladó,* 33 D.P.R. 869; *El Pueblo* v. *Rodríguez,* 41 D.P.R. 384; *El Pueblo* v. *González,* 42 D.P.R. 224; *El Pueblo* v. *Quirós,* 48 D.P.R. 962.

Esta Corte Suprema, en el caso de *El Pueblo* v. *Martí,* 43 D.P.R. 441, dijo:

"A nuestro juicio la negativa de la corte estuvo bien fundada. En primer lugar, leídas las instrucciones que la corte había ya transmitido al jurado encuéntrase que son suficientes por sí solas, siendo, por tanto, la propuesta innecesaria. En segundo lugar la forma en que la instrucción está redactada parece expresamente calculada para favorecer al acusado. Y en tercer lugar el caso de Casanovas, de donde al parecer se toma la doctrina en que se basa la instrucción, era distinto."

La misma doctrina está firmemente sentada por las cortes de California en numerosas decisiones, y aparece así resumida:

"Párrafo 366.—*Denegación de instrucciones ya cubiertas por otras.* —La Corte no está obligada a exponerle la ley al Jurado más de una vez, pero puede, por regla general, rehusar instrucciones propuestas que estuvieren ampliamente cubiertas por otras instrucciones. Un acusado no tiene el derecho a que su fraseología particular para exponer la ley sea adoptada por la Corte y trasmitida al jurado. Es suficiente si la sustancia de la ley aplicable a su caso es expuesta por la corte correctamente en sus instrucciones." 8 California Jurisprudence, 314.

La corte procedió correctamente al negarse a dar la instrucción a que se refiere el quinto de los alegados errores. Los hechos en el caso de *El Pueblo* v. *Méndez,* 40 D.P.R. 757, eran enteramente distintos a los del caso de autos. En aquel caso, esta corte, después de hacer un resumen de la prueba, dijo:

"Aunque el jurado no haya creído los testigos de la defensa respecto a la manera en que fué causada la muerte, prueba que presenta un claro caso de exención de responsabilidad por haber matado el apelante en defensa de su hogar, creemos que, independientemente de ella, la prueba del fiscal es de tal naturaleza que lleva a la misma conclusión."

La instrucción propuesta por la defensa ha sido copiada literalmente del sumario de *El Pueblo* v. *Méndez,* supra, y la forma en que está redactada indica claramente que el propósito de la defensa fué favorecer al acusado induciendo al jurado a aceptar como un hecho probado que el acusado había matado en defensa de su hogar y para evitar una agresión por parte del interfecto en contra de la esposa del acusado. En el presente caso, si se descarta la prueba de la defensa, la prueba presentada por el fiscal es sin duda alguna suficiente para justificar el veredicto del jurado. Y aún cuando diéramos crédito a toda la prueba de la defensa, no encontramos en ella base para sostener que la esposa del acusado había estado en peligro alguno de ser agredida por el interfecto.

La instrucción propuesta por la defensa, comprendida en el alegado error séptimo, está basada en la doctrina sentada por este tribunal en el caso de *El Pueblo* v. *Pacheco*, 40 D. P.R. 394, con estas palabras:

"En una causa criminal, cuando se prueba claramente un caso de muerte, el peso de la prueba recae sobre el acusado para demostrar por lo menos un caso prima facie de defensa propia. Una vez que se establece un caso prima facie, si hay duda razonable respecto a si el acusado actuó o no en defensa propia, debe absolvérsele. 13 Cal. Jur. 737, pág. 104."

Las instrucciones dadas por la corte en el caso de autos cubrieron perfectamente el punto legal propuesto por la defensa y se ajustaron a la doctrina de *El Pueblo* v. *Pacheco,* supra. La corte dijo:

"El acusado alega la defensa propia y él está en la obligación de aportar evidencia en apoyo de su alegación, pero él no está en la obligación de aportar, de introducir evidencia suficiente para convencer al Jurado que él actuaba en defensa propia fuera de duda razonable. Quiere decir, que está en la obligación de aportar evidencia, fuera de duda razonable, de que actuaba en defensa propia. Es suficiente si él introduce evidencia de la defensa propia, que considerada por los señores del Jurado en conjunto con toda la evidencia del caso, levante en la mente de los señores del Jurado una duda razonable de la culpabilidad del acusado."

La corte inferior no erró al denegar la instrucción que estamos discutiendo, pues su trasmisión al jurado hubiese sido una repetición innecesaria de lo que ya había dicho la corte y seguramente hubiese confundido al jurado. La instrucción dada por la corte era amplia y suficiente y como tal fué aceptada por la defensa al no tomar excepción en su contra.

Las instrucciones denegadas que aparecen comprendidas en los alegados errores décimo y undécimo, estaban ampliamente cubiertas por las instrucciones dadas por la corte. No era necesario repetirlas. Y la corte no cometió error al negarse a dar aquellas partes de dichas instrucciones que no estaban justificadas por la prueba practicada durante el juicio y que hubiesen confundido o inducido a error al jurado.

Quedan desestimados los alegados errores Núms. 5°., 7°., 10°., y 11°. por carecer de méritos suficientes para justificar la revocación solicitada.

6°.—Que la Corte sentenciadora cometió error al denegar la siguiente instrucción:

"La corte os instruye que la parte que voluntariamente suprime evidencia de que dispone lo hace porque de ofrecerla le sería adversa. En este caso el Fiscal suprimió el testimonio del testigo Gustavo Adolfo Ramírez. Artículo 102, inciso 5, Ley de Evidencia; *Méndez* v. *González et al.*, resuelto por el Honorable Tribunal Supremo en junio, 1934."

En sus instrucciones al jurado la corte había ya dicho:

"La Ley de Evidencia dice que 'toda evidencia voluntariamente suprimida, resultaría adversa si se ofreciera.' Me he referido al testimonio del testigo Gustavo Adolfo Ramírez de Arellano. El testigo Gustavo Adolfo Ramírez de Arellano declaró brevemente ante la Corte; estaba a disposición de ser llamado por cualquiera de las partes. Se puede considerar que ha sido la evidencia suprimida por ambas partes. Cualquiera de las partes podía utilizar el testimonio de él; estaba en la Corte, bajo las órdenes de la Corte durante la celebración del juicio. La Corte instruye al Jurado que la palabra 'suprimir,' de acuerdo con el diccionario español, quiere decir 'omitir.' "

La defensa hizo anotar su excepción a la instrucción que acabamos de transcribir.

La simple lectura de la instrucción dada y de la denegada es suficiente para ver que son prácticamente iguales, con la única diferencia que la corte aplicó a ambas partes la presunción que se levanta del hecho de no presentar evidencia que ha podido ser presentada. La parte apelante no puede quejarse de la instrucción dada por la corte, en cuanto al fiscal se refiere, pues dicha instrucción cubre el punto legal sugerido por la instrucción denegada.

¿Tiene razón el apelante, al decir que la corte inferior erró al instruir al jurado que la evidencia había sido suprimida por ambas partes? Creemos que no. Debemos recordar que cuando terminó el examen de Gustavo Adolfo Ramírez de Arellano, como testigo de la acusación, el abogado defensor solicitó de la corte que dictase una orden para que el testigo quedara bajo las reglas de la corte; y así fué ordenado, quedando el testigo a disposición de ambas partes hasta la terminación del juicio. No aparece de los autos nada que demuestre que la defensa hubiere sido impedida en modo alguno de utilizar a dicho testigo como testigo de descargo, después de haber pedido que quedase bajo las reglas de la corte. Y por eso creemos que la corte no erró al sostener que la supresión o no utilización de ese testigo, que estuvo a disposición de la defensa durante todo el juicio, creó la presunción de que su declaración hubiese resultado adversa al acusado.

La presunción que se levanta de la supresión voluntaria de evidencia es controvertible mediante otra evidencia; y puede convertirse en irrevocable mediante prueba demostrativa de que la evidencia suprimida era en realidad adversa a la parte que pudiendo haberla utilizado la suprimió.

Los autos no contienen dato alguno que nos informe sobre lo que en realidad hubiera podido declarar el testigo si hubiese sido llamado. Solamente aparece que el testigo estaba

presente en el sitio en que ocurrieron los hechos. Al no utilizarlo como testigo de los hechos principales del caso, el fiscal dió lugar a que se levantase en su contra la presunción de que suprimía esa evidencia porque temía que le resultase adversa. Y la corte instruyó debidamente al jurado en cuanto a ese extremo.

El apelante cita en su alegato el caso de *El Pueblo* v. *Campán,* 34 D.P.R. 107, como aplicable al caso de autos. No vemos la analogía entre uno y otro caso. En *El Pueblo* v. *Campán,* supra, el fiscal citó cinco testigos, examinó tres y renunció los dos restantes por ser evidencia acumulativa. El acusado entonces utilizó dichos dos testigos y probó con sus declaraciones que éstas no eran evidencia acumulativa, sino evidencia adversa al fiscal. Y como es natural esta corte sostuvo que la presunción de ley "se vió confirmada en la realidad."

El apelante en este caso no procedió como lo hizo el acusado Campán. Hizo poner al testigo renunciado o suprimido por el fiscal bajo las reglas de la corte, con el propósito evidente de utilizarlo como testigo de defensa, para después suprimirlo a su vez, levantando así en su contra, como ya lo había hecho el fiscal, la presunción que nace de la supresión de evidencia que ha podido utilizarse. El apelante tuvo una oportunidad de confirmar en la realidad la presunción de ley en contra del fiscal, y no se aprovechó de esa oportunidad por el temor de que el testigo pudiera resultarle adverso y favorable a la acusación. Y no nos convencen las razones aducidas por el alegato del apelante para explicar o excusar la no utilización por la defensa del testigo Ramírez de Arellano, a quien ya se presumía adverso al fiscal, después de haberle tenido a su disposición y bajo las reglas de la corte durante los tres días del juicio.

Es cierto que un acusado está protegido por la presunción de inocencia que la ley establece a su favor y que no está obligado a declarar ni a presentar prueba alguna en

su defensa. Pero también es cierto que si una vez probado el hecho de la muerte a manos del acusado, éste alega la defensa propia, sobre él recae entonces el peso de la prueba para establecer por lo menos un caso prima facie de legítima defensa. Y como consecuencia tenemos que llegar a la conclusión de que si un acusado, durante el trámite de substanciación de su alegada legítima defensa, suprime voluntariamente la declaración de un testigo que tiene a su disposición, esa supresión de evidencia da lugar a la presunción de que la evidencia fué suprimida por el temor de que le fuera adversa.

Resolvemos, por lo tanto, que la corte no cometió error perjudicial al acusado, ni al dar la instrucción en la forma en que lo hizo ni al denegar la propuesta por la defensa, y que el alegado error número sexto debe ser desestimado.

■ 8º.—Que la corte inferior cometió error al denegar la siguiente instrucción propuesta por la defensa:

"La corte os instruye que el peso de la prueba para demostrar que el acusado mató a la víctima deliberadamente y con malicia premeditada recae sobre el gobierno en un caso de asesinato. De modo que el acusado, no tiene que probar nada hasta que no se demuestre que él mató deliberada y premeditadamente, con malicia, al hoy interfecto Rafael Vives Nazario."

Y dice la ilustrada representación del apelante en su alegato:

"La instrucción cuya negativa motiva este error está fundada en la presunción de la inocencia que acompaña a todo acusado, y en el hecho de que la evidencia para considerar al acusado culpable debe convencer más allá de toda duda razonable."

Veamos lo que dijo la corte inferior en cuanto al punto legal propuesto en la instrucción denegada:

"El acusado es considerado inocente hasta que se pruebe su culpabilidad fuera de duda razonable, y en caso de existir una duda razonable, una duda fundada de la culpabilidad del acusado, es el deber del Jurado declararle no culpable . . .

"La duda razonable, señores del Jurado, es una duda fundada, una duda que surge de la evidencia. No es una duda caprichosa, sin razones, sin fundamentos . . .

"La duda razonable existe cuando después de considerar y deliberar sobre toda la evidencia del caso, las mentes de los señores Jurados quedan en aquel estado que impide a ellos estar convencidos hasta una certeza moral de la verdad de la acusación, de la culpabilidad del acusado. . .

"Ahora: si ustedes creen, señores del Jurado, considerada toda la evidencia del caso, tanto la evidencia del Ministerio Fiscal como la evidencia de la defensa, que existe duda razonable, duda fundada de la culpabilidad del acusado, entonces deben declararle no culpable."

Aquella parte de la instrucción propuesta sobre la que el acusado tenía derecho a que se le instruyese al jurado, quedó ampliamente cubierta por la instrucción dada por la corte. El jurado fué debidamente instruído en cuanto a la presunción de inocencia a favor del acusado, en cuanto a la obligación de la acusación de probar la culpabilidad fuera de duda razonable y en cuanto a la obligación del jurado de dar el beneficio de la duda al acusado. A eso, y no a más, tenía derecho el apelante.

El apelante no tenía derecho a exigir que la corte diese la instrucción en la forma propuesta, porque dicha instrucción es claramente errónea y contraria a lo resuelto en el caso de *People* v. *Cohn*, 76 Cal. 386, citado por el apelante como autoridad para sostener su contención. La opinión de la corte en dicho caso es tan corta, que vamos a transcribirla íntegra:

"El acusado pidió a la Corte que instruyese así al Jurado: 'Sobre la acusación recae el peso de establecer *todos los elementos del delito del cual puede ser convicto el acusado, más allá de una duda razonable.*' Por inadvertencia, o por alguna otra razón que no aparece de los autos, la corte denegó la instrucción solicitada, *y omitió el dar cualquiera otra instrucción de igual naturaleza, o que expusiese o se refiriese a la regla en cuanto a la duda razonable en casos criminales.* El acusado tomó la debida excepción a la negativa de la corte a dar la instrucción solicitada. Se revoca la sentencia y se devuelve la causa para nuevo juicio." (Bastardillas nuestras.)

La instrucción denegada por la corte en el presente caso no se ajustaba a la regla de *People* v. *Cohn,* supra. De

acuerdo con la acusación formulada en el caso de autos, el acusado podía ser convicto de asesinato en primer grado o de asesinato en segundo grado o de homicidio voluntario. La instrucción propuesta por la defensa tendía a excluir de la mente del jurado la idea de que el acusado pudiese ser convicto de homicidio voluntario, o sea de haber dado muerte a su víctima sin deliberación y sin premeditación. La trasmisión de la instrucción propuesta hubiera equivalido a decirle al jurado: "Si el fiscal no prueba que el acusado mató deliberada y premeditadamente, con malicia, debéis absolverlo."

La sentencia en *People* v. *Cohn,* supra, fué revocada, no solamente porque la corte se negó a dar la instrucción solicitada, sino especialmente porque omitió por completo dar instrucciones en cuanto a la duda razonable En el caso de autos, la corte, además de las instrucciones que hemos transcrito y que consideramos suficientes en cuanto a la obligación de dar al acusado el beneficio de la duda razonable, dió instrucciones específicas sobre cada uno de los delitos de que podía ser convicto el acusado, insistiendo en cada caso en que si el jurado tenía una duda razonable debían darle el beneficio de ella al acusado.

La corte inferior procedió correctamente al denegar la instrucción solicitada. Y el error número octavo queda desestimado.

9º.—Que la Corte inferior cometió error al negar la siguiente instrucción:

"La Corte os instruye que para que los señores del Jurado puedan traer un veredicto de culpabilidad contra el acusado, es necesario que estén convencidos de que no existe ninguna otra hipótesis razonable en cuanto a cómo ocurrieron los hechos, que sea incompatible con el hecho de la culpabilidad. En otras palabras, si existe una hipótesis razonable de que los hechos ocurrieron de un modo distinto a como se alega en la acusación, tal hipótesis excluye la certeza absoluta de la culpabilidad del acusado, y entonces los señores del Jurado deben traer un veredicto absolutorio."

El *issue* planteado por las teorías de la acusación y de la defensa era único, claro y específico. Sostuvo el fiscal que el acusado dió muerte ilegal, con malicia premeditada, al interfecto Rafael Vives. Admitió la defensa que la muerte de Vives había sido causada por el acusado, pero alegó, en justificación del homicidio, que el acusado había dado muerte a Vives en el ejercicio de su derecho de legítima defensa, para rechazar la agresión de Vives y para evitar que éste le matara. Una y otra teoría fueron sostenidas por prueba testifical, y ni una ni otra se basaron en cuestiones hipotéticas ni en pruebas circunstanciales de las cuales pudiese deducirse que el hecho había sido realizado de acuerdo con otra teoría distinta a las que habían sido propuestas por las partes. La instrucción propuesta por la defensa, aunque correctamente redactada, no era adaptable a los hechos del caso establecidos por toda la prueba practicada por ambas partes. La corte no erró al denegarla. Su trasmisión al jurado hubiese creado una confusión en la mente de los jurados, con perjuicios tal vez para el mismo acusado, pues los jurados hubieran podido interpretar la solicitud de la defensa para que se diese esa instrucción como una falta de confianza por parte del acusado en la solidez de su teoría de defensa propia.

■ 12º.—Que la Corte inferior erró al dar al Jurado la siguiente instrucción:

"La Corte instruye al Jurado que de acuerdo con nuestras leyes no existe la defensa del honor y la dignidad. Eso no existe. Aquí la cuestión es la defensa propia. Está admitido que el acusado causó la herida que produjo la muerte del interfecto Vives Nazario, y él alega la defensa propia. Ésa es la cuestión para ustedes resolver; éso es el *issue*. Naturalmente, si obró en defensa propia, aceptando las instrucciones que ha dado la Corte sobre esa cuestión, no hay ninguna otra circunstancia fuera de la evidencia."

Creemos que la instrucción es correcta. La ley reconoce el derecho de toda persona a defender su propia vida contra una agresión ilegal, pudiendo llegar hasta quitar la vida a

su agresor, si fuere preciso hacerlo para salvar la propia. Pero no existe ley alguna que reconozca el derecho a rechazar ofensas al honor o a la dignidad personal, o al honor o a la dignidad de un familiar, hasta el punto de quitar la vida al ofensor.

La declaración del acusado tendió en parte a justificar la muerte del interfecto, alegando que éste había proferido palabras insultantes y ofensivas a la dignidad de la esposa del acusado. Y teniendo eso en cuenta, la corte procedió correctamente al instruir al jurado que aun admitiendo que esas palabras ofensivas fueran pronunciadas, ellas no serían suficientes para justificar un homicidio.

13º.—Que la Corte de Distrito cometió error al denegar la petición de nuevo juicio.

La moción para que se concediera un nuevo juicio estaba basada en los doce alegados errores que ya hemos discutido y resuelto, y en los siguientes puntos adicionales:

A.—Que la Corte inferior erró al señalar la vista del caso, sin sujeción al orden del registro de causas, en violación de la Regla 5 de las cortes de distrito.

B.—Que la Corte erró al resolver que los jurados Luis Bolta y Constantino Santos, por el hecho de ser Tesorero Auxiliar de Mayagüez el primero, y Tesorero de Añasco el segundo, no podían actuar como jurados y procedía su recusación.

C.—Que la Corte erró al disponer que el Presidente del Jurado, Sr. Lespier, escribiera el veredicto en corte abierta.

D.—Que el veredicto se obtuvo por medios que no fueron una verdadera expresión de la opinión de todos los miembros del jurado.

E.—Que el jurado que entendió en la causa fué constituído por doce miembros entre los cuales se encontraba uno, José Ayala, que fué convicto de *felony;* y que este hecho no fué conocido por el acusado hasta después de haberse rendido el veredicto.

F.—Que el acusado ha descubierto nuevas pruebas que pueden favorecerle, las cuales no le fué posible descubrir y aducir en el acto del juicio.

G.—Que el veredicto es contrario a la prueba y contrario a derecho.

Consideramos ahora todos estos puntos en el mismo orden en que han sido enumerados.

A.—Alega el apelante, que en la fecha en que se hizo el señalamiento de esta causa para juicio, había treinta y tres causas pendientes, que habían sido presentadas con anterioridad al caso de autos; que esto no obstante, la corte señaló este caso como caso único para ser visto en un término especialmente convocado, sin exponer razones o fundamentos para tal resolución; y que el no haberse seguido la Regla 5 de la corte es motivo para un nuevo juicio.

No alega el apelante, ni aparece de los autos, que las 33 causas que dice fueron presentadas con anterioridad a este caso estuvieran listas para juicio; ni tampoco alega que el señalamiento hecho por la corte causara perjuicio alguno al acusado en la preparación de su defensa. Además, la relación de causas anteriores pendientes que se hace en la moción de nuevo juicio carece de los requisitos necesarios para darle la debida autenticidad, y no puede servir de base para la discusión y resolución del error señalado. Véase: *El Pueblo* v. *Crespo,* 40 D.P.R. 379.

 La regla que se alega haber sido violada, dice:

"Regla 5.—Al hacerse la primera llamada del Registro General de Causas, la Corte dictará una orden señalando día dentro del término más breve posible para la llamada a juicio de las causas anotadas en el Registro de Causas por jurado, en cuya fecha las causas por jurado se llamarán y se dispondrá de ellas por su orden en el Registro."

De los autos aparece que el acusado hizo una moción para que se suspendiese la vista por el fundamento, entre otros, de que había otros casos anteriores al presente; y que la corte declaró con lugar la moción, ordenando que la vista del caso, que había sido señalada para el día 23 de julio de 1934, fuese pospuesta hasta el día 7 de agosto de 1934. No aparece de los autos que el acusado tomara excepción a la

resolución de la corte; y por el contrario aparece que el acusado compareció al juicio e hizo su alegación de inocencia, sin hacer objeción alguna a que el juicio se celebrase en la fecha fijada por la corte al resolver la moción de suspensión. Y eso bastaría para que desestimáramos el alegado error sin más consideración. Véanse: *People* v. *Winthrop*, 118 Cal. 85; 8 R.C.L. 68.

Las cortes tienen amplia discreción para fijar fechas para la celebración de juicios de causas pendientes ante ellas, y los tribunales de apelación no deben intervenir para controlar el ejercicio de esa discreción, a menos que se hubiere abusado de ella. Véanse: 21 Enc. Pl. & Pr., p. 975; *State* v. *Kelly*, 21 A.L.R. 156; *State* v. *Silvius*, 22 R. I. 322; *State* v. *Parry*, 26 N. M. 469.

En el caso de *State* v. *Kelly*, supra, el acusado había sido procesado y tenía varias causas pendientes por delitos similares. Para evitar defectos técnicos en las anteriores acusaciones, el fiscal presentó una nueva acusación el 31 de marzo de 1919. La corte señaló la vista para el día siguiente, 1°. de abril. Al ser llamado el caso, el acusado formuló su oposición y protestó de que se le obligase a entrar a juicio, alegando que se le privaba del derecho constitucional de estar acompañado por su abogado y de presentar testigos en su defensa. La Corte de Apelación sostuvo a la inferior, diciendo:

"La fijación de la fecha para la celebración del juicio en una causa, está sujeta a la discreción de la corte ante la cual ha de verse el caso, y, a falta de una demostración de prejuicio, la resolución de la corte sobre el particular no será revocada en apelación. No se ha probado prejuicio en el presente caso."

Y al interpretar el estatuto de New Mexico que provee que será el deber del juez de distrito fijar un día para la vista de cada caso criminal, cuyo día no será antes del tercer día del término, y será fijado por el juez con no menos

de veinte días de anterioridad al primer día del término en que que ha de verse el caso, la misma corte dijo:

"El estatuto es solamente directivo (*directory*). Si sostuviéramos que es mandatorio, entonces no podría verse ningún caso durante el término dentro del cual se presentó la acusación; y siempre ha sido la práctica de las cortes de distrito del estado señalar casos para juicio dentro del término en que fué presentada la acusación."

Las disposiciones de la Regla 5, supra, y las del artículo 181 del Código de Enjuiciamiento Criminal (ed. 1935) son de carácter directivo y no mandatorio y la corte tiene amplia discreción para señalar las fechas en que habrán de celebrarse las vistas de causas pendientes ante ella. El propósito evidente y la razón fundamental de dichas disposiciones legales es proteger el derecho que tiene todo acusado a que se le conceda un juicio rápido, evitando que se dé la preferencia a las causas recientes en contra de las presentadas con anterioridad. En el caso de autos, el apelante se queja de que se le haya dado un juicio más rápido de lo que él esperaba.

No habiéndose hecho oposición alguna a la celebración del juicio en la fecha señalada por la corte, ni imputádosele a la corte inferior abuso de discreción o prejuicio; y no apareciendo del récord que el acusado haya sido perjudicado en sus derechos esenciales, debemos sostener y sostenemos que la corte inferior actuó correctamente y que debe desestimarse el error señalado.

■■ B.—Entre los miembros del *panel* de jurados figuraba el Sr. Luis Bolta. Al ser examinado por el fiscal dijo tener conocimiento de los hechos del caso por la prensa y haber formado una opinión firme, pero que variaría esa opinión de acuerdo con la prueba; que es empleado municipal, desempeñando el cargo de Subtesorero del Municipio de Mayagüez, y que por ese hecho se encuentra en una situación incómoda, molesta e intranquila por no saber el tiempo que va a durar el juicio. Al preguntarle el fiscal: "A posar de

esa situación de ser empleado municipal, ¿usted desea continuar siendo jurado?," respondió: "si se me excusara lo agradecería." El fiscal le recusó motivadamente, porque el jurado estaría intranquilo y esa intranquilidad afectaría la decisión del caso. Objetó la defensa que eso sería motivo para que el jurado pidiera a la corte que lo excusara, pero no constituye motivo para una recusación motivada. La corte declaró con lugar la recusación motivada y la defensa tomó excepción. Igual sucedió al ser llamado el jurado Constantino Santos, quien al ser informado por el fiscal de que tenía el derecho a ser excusado de servir como jurado, por ser Tesorero Municipal de Añasco, contestó: "No tengo interés en estar aquí ni en recusarme."

No estamos convencidos de que se haya cometido error al permitir la recusación motivada de dichos dos jurados. La corte inferior, en uso de su discreción, pudo haber interpretado la actitud y las palabras de uno y otro jurado como expresivas del deseo de ser excusados por ser ambos empleados municipales, y pudo excusarlos de servir en el caso. El fiscal pudo recusarlos a ambos perentoriamente, pues de los autos no aparece que el Ministerio Público hubiese agotado sus recusaciones perentorias.

En la obra Corpus Juris encontramos lo siguiente:

"Está bien establecido que la corte puede, por razones que en el ejercicio de su discreción cree suficientes, excusar de servir a jurados que han sido citados ... Aunque en algunos casos el derecho está reconocido por estatuto, no es necesaria autorización estatutaria expresa para ese propósito. Las razones son tan numerosas que no pueden ser especificadas de antemano o reducidas a una regla fija, sino que deben dejarse para que la corte las resuelva según se vayan presentando, de manera que se ha sostenido uniformemente que la excusa de un jurado es asunto que depende de la sana discreción de la corte, el ejercicio de la cual no será revisado a menos que se demuestre claramente que se ha abusado de ella, con perjuicio efectivo para la parte querellante." 35 C. J., párrs. 309 y 310, p. 306–7.

"La Corte puede debidamente excusar a una persona citada para servir como jurado, cuando tal servicio podía estar en conflicto con

el desempeño de otros deberes públicos, y puede hacerlo, aunque tales deberes no constituyan causa bastante para descalificar al jurado o para darle derecho a reclamar una exención del servicio.'' 35 C. J., párr. 311, pág. 308.

El hecho de que los dos jurados fuesen recusados motivadamente en vez de excusados carece en nuestra opinión de importancia. El efecto para el acusado es el mismo que si la corte, en uso de su discreción, los hubiese excusado.

En la moción de nuevo juicio no se alegó que la corte abusara de su discreción, ni qué actuara movida por prejuicio alguno en contra del acusado; y tampoco se alegó que el acusado sufriera perjuicio alguno por el hecho de no haber figurado en el jurado los señores Bolta y Santos.

En el caso de *Hayes* v. *Missouri*, 120 U. S. 68, 71, la Corte Suprema de los Estados Unidos dijo:

''El derecho de recusar es el derecho de rechazar y no el de seleccionar un jurado. Si de aquéllos que quedan se obtiene un jurado imparcial, entonces el derecho constitucional del acusado ha sido sostenido.''

No se ha alegado en este caso que el jurado que entendió en la vista de la causa fuera injusto o parcial o incompetente. Creemos, por lo tanto, que los derechos esenciales del acusado no han sido perjudicados por la resolución de la corte en cuanto a los citados jurados y que el alegado error debe ser desestimado.

■ C.—Se ha alegado que la corte inferior cometió error al disponer que el presidente del jurado escribiera el veredicto en corte abierta.

Sobre este particular, la moción de nuevo juicio dice:

''Según información y creencia del acusado, en el acto de rendir el veredicto del jurado, el Hon. Juez de esta Corte llamó al Presidente Sr. Lespier, a quien le instruyó para que escribiera algo en relación con el veredicto, no habiendo podido enterarse la defensa de lo que el Hon. Juez dijo a dicho Presidente Sr. Lespier, siendo así que en la mesa del Márshal el citado Sr. Lespier escribió algo que el acusado no pudo descubrir en aquel momento. Por lo que poste-

riormente ha podido averiguar el acusado, sostiene por información y creencia, que cuando el veredicto fué entregado para que fuese leído por el Secretario, en tal veredicto no se indicaba si se había declarado culpable o inocente al acusado de delito alguno. En este instante llamó el Juez al Presidente del jurado y le dijo algo que el acusado no pudo saber, pero es lo cierto que entonces dicho señor Lespier escribió de su puño y letra en el pliego que luego entregó nuevamente a la Corte, hecho que, como dijimos antes, lo verificó en el escritorio del Márshal, en corte abierta.''

Ninguna de esas alegaciones, todas ellas hechas por información y creencia del acusado, está sostenida ni por pruebas presentadas en apoyo de la moción de nuevo juicio, ni por constancia alguna en los autos del caso. Por el contrario, de los autos consta que el veredicto declaró al acusado culpable de asesinato en segundo grado y que al pie del veredicto aparece la firma de R. J. Lespier, Presidente del Jurado.

Este tribunal no puede considerar cuestiones que no aparecen de los autos o que no le han sido sometidas con los caracteres necesarios de autenticidad para que le merezcan crédito.

Si los hechos tan vagamente expuestos en la moción de nuevo juicio ocurrieron en la forma en que se han relatado, el acusado, que estaba presente y asistido de competentes abogados, debió cerciorarse mejor de lo ocurrido, para formular una objeción y anotar su excepción en contra de cualquiera informalidad que pudiera haberse cometido. El acusado pudo también haber solicitado la votación individual de cada uno de los jurados (*polling of the jury*), para determinar si estaban conformes con el veredicto leído en corte abierta, y no lo hizo, renunciando así a ese derecho.

Se desestima el error señalado por carecer de fundamentos.

■ D.—Consideraremos ahora la alegación que hace el apelante de que el veredicto fué obtenido por medios que no fueron una verdadera expresión de la opinión de todos los miembros del jurado.

En apoyo de esta contención y como anexos a la moción de nuevo juicio el acusado presentó declaraciones juradas de dos de los miembros del jurado.

El jurado Eladio Talavera declara que cuando el jurado se retiró a deliberar, después de haber oído las instrucciones de la corte, él fué de opinión que debía dictarse un veredicto de culpable de homicidio voluntario, por creer que la muerte había ocurrido durante una riña; que otros jurados opinaban lo mismo, pero que la mayoría era partidaria de un veredicto de asesinato en segundo grado; que en vista de esa diferencia de criterio, el Presidente del Jurado, Sr. Lespier, llamó aparte al declarante y le propuso que dieran un veredicto de asesinato en segundo grado, recomendando clemencia, lo que era equivalente a un homicidio voluntario; que creyendo que eso era verdad, aceptó el veredicto y cuando fué preguntado por el secretario si ése era su veredicto respondió que sí; que después se enteró que los dos delitos son distintos y que la corte puede o no hacer uso de la clemencia; que también se enteró que la sentencia máxima que se puede imponer en casos de homicidio es diez años de presidio, mientras que en el asesinato en segundo grado el mínimum es de diez años; y que de haber sabido todo eso antes, él no hubiese dado el veredicto que rindió el jurado.

La declaración del jurado Manuel Fernández es sustancialmente igual a la del jurado Talavera.

La cuestión que se presenta a nuestra consideración ha sido resuelta desfavorablemente para el apelante en numerosas decisiones, que examinaremos brevemente.

"Y aun en aquellas jurisdicciones que todavía observan la antigua regla y generalmente admiten *affidavits* de jurados, la regla no se extiende hasta incluir *affidavits* en los que se alegue que los jurados entendieron mal las instrucciones de la Corte. Si ellos difieren en cuanto a las instrucciones de la Corte, deben volver al salón para que les sean repetidas; y si dejaren de hacer eso, no se les debe permitir alegar después cuáles fueron sus impresiones o puntos de vista con respecto a las instrucciones. Si fuese la costumbre recibir *affi-*

*davits* de jurados para explicar los fundamentos de sus conclusiones, en casos disputados, pocos veredictos se sostendrían, pues podrían encontrarse jurados que alegasen como errores de derecho o de hecho, al dictar su veredicto, lo que en realidad no eran más que pensamientos posteriores, producidos por conversaciones con las partes interesadas . . .

"Por las mismas razones el *affidavit* de un jurado no puede ser recibido para impugnar su propio veredicto demostrando que interpretó mal la evidencia o cuáles fueron sus impresiones en cuanto al efecto de su veredicto, o que él tenía una intención diferente a la expresada por el veredicto. Ni pueden admitirse *affidavits* de jurados, explicando la teoría o fundamentos sobre los cuales basaron su veredicto, con el propósito de impugnarlo." 27 R.C.L., párr. 69, págs. 897 y 898.

En el caso de *Hughes* v. *State,* 148 S. W. 543, 556, en el que las declaraciones de los jurados eran más fuertes aún que en el caso de autos, y el acusado fué convicto de asesinato en primer grado y condenado a cadena perpetua, la corte sostuvo que no podían admitirse *affidavits* en los que se alegaban solamente los argumentos que habían usado otros jurados para convencer al jurado declarante. E igual resolución fué dictada en el caso de *Lee* v. *State,* 121 Tenn. 521, 116 S. W. 881, en el que el acusado fué condenado a la pena capital. Véanse: *People* v. *Gray,* 61 Cal. 164; *People* v. *Holms,* 118 Cal. 448; *People* v. *Murphy,* 146 Cal. 502.

La decisión en *People* v. *Soap,* 127 Cal. 408, es aplicable al caso de autos. Dijo la corte:

"Contende el apelante que la sentencia debe ser revocada por causa de la alegada impropia conducta del jurado, la que impidió que los jurados diesen al caso la debida y justa consideración. La alegada conducta impropia consistía en el hecho, que el apelante trató de probar con el *affidavit* de un jurado, de que mientras el jurado estaba deliberando sobre el caso, uno de los jurados hizo la manifestación de que un veredicto de homicidio podría dar lugar tan sólo a un castigo de prisión en la cárcel del condado por seis meses, y que esa manifestación indujo a un gran número de jurados que habían estado votando en favor de la absolución a convenir en un veredicto de homicidio. Esta contención no puede ser sostenida; por-

que ha sido definitivamente resuelto que el *affidavit* de un jurado no puede ser recibido para impugnar el veredicto, excepto cuando éste ha sido el resultado de algún recurso adoptado para determinarlo mediante la suerte.''

La misma cuestión aquí planteada ha sido ya considerada por esta Corte Suprema en varios casos, en los que las decisiones son adversas a la contención del apelante. Véanse: *El Pueblo* v. *Lebrón,* 47 D.P.R. 430, 431, y *El Pueblo* v. *Cruz,* 49 D.P.R. 653, 656.

Se desestima el error señalado por falta de méritos.

■ E.—Que entre los miembros que constituyeron el jurado se encontraba el individuo José Ayala, quien había sido convicto de *felony,* estando por tanto incapacitado para actuar como jurado; y que ese hecho no fué conocido por el acusado hasta después de haberse rendido el veredicto. Y se cita en apoyo de esta contención el artículo 187 del Código de Enjuiciamiento Criminal, que dispone que no es competente para actuar como jurado quien haya sido convicto de un delito grave.

Alega el apelante que al hacerse las preguntas generales a todos los jurados se preguntó a todos y a cada uno de ellos si habían sido convictos de *felony* y todos permanecieron silenciosos.

En su oposición a la moción de nuevo juicio, el fiscal que sostuvo la acusación declara bajo juramento que ''al jurado no se le preguntó, ni por la defensa ni por el fiscal, nada en relación sobre si habían sido convictos de *felony* y por lo tanto nada en contrario podían haber contestado los jurados''; que el abogado Amador Ramírez Silva, quien estuvo a cargo de la selección del jurado conocía a José Ayala y le constaba personalmente que había sido convicto de *felony;* y que también sabía que Ayala había sido rehabilitado en sus derechos civiles por el Gobernador de Puerto Rico.

De los autos no aparece dato alguno que pueda ayudar a este tribunal de apelación a resolver el *issue* planteado por las manifestaciones contradictorias que hacen la defensa

y el fiscal. Si fuese cierto, como alega el apelante, que el abogado defensor preguntó a todos los jurados si alguno de ellos había sido convicto de *felony*, y que el jurado Ayala no contestó nada, en ese caso tendríamos que concederle algún mérito a la cuestión que discutimos. Pero el hecho es que el apelante no solamente no ha presentado prueba alguna, ni constancia alguna de los autos, para sostener su alegación, sino que el propio fiscal bajo juramento impugna la veracidad de la alegación y sostiene enfáticamente que no se hicieron tales preguntas a los jurados. La corte inferior consideró esa cuestión al resolver la moción de nuevo juicio y la resolvió en contra del apelante. El juez sentenciador estaba en mejores condiciones que nosotros para resolver el conflicto, pues habiendo presidido la vista del caso quizás tenía algún recuerdo de lo que realmente ocurrió durante el examen y selección del jurado.

▆ Si aceptáramos, como contiende el fiscal, que el abogado defensor no hizo a los jurados la pregunta referente a haber sido convictos de *felony*, en ese caso, de acuerdo con las autoridades que hemos examinado, tendríamos que desestimar el error señalado por el apelante, pues a un acusado no puede permitírsele que después de haber tenido una oportunidad de examinar a los jurados en cuanto a su competencia para actuar como tales y de no haber hecho uso de esa oportunidad por descuido o falta de diligencia, presente como fundamento para la concesión de un nuevo juicio la falta de competencia de uno de los jurados por él ya aceptados.

▆ En el caso de *People* v. *Chung Lit,* 17 Cal. 321, en el que se descubrió después del veredicto que uno de los jurados era extranjero, se resolvió:

"La objeción de que uno de los jurados era un extranjero no podía presentarse por vez primera en la moción de nuevo juicio. Los acusados podían haberlo examinado en cuanto a ese punto y haber hecho uso de su derecho a recusarlo antes de que prestara juramento; pero habiendo dejado de hacerlo, deben sufrir las consecuencias de su propio descuido."

En *Bristow's Case,* 15 Grattan, 648, citado en *People* v. *Mortier,* 58 Cal. 267, se dijo:

"Es motivo principal para recusar un jurado el que haya formado parte del Gran Jurado que presentó la acusación, pero a menos que sea recusado antes de prestar juramento, la objeción será tenida por renunciada, y su presencia en el jurado no viciará el veredicto . . . Permitir a los acusados que se aprovechen, después del veredicto, de objeciones preexistentes en cuanto a la competencia de los jurados, como cuestión de derecho, no solamente sería falta de razón, sino altamente funesto en sus consecuencias. Las dilaciones en la administración de la justicia penal y las oportunidades de impunidad para los culpables aumentarían grandemente. Veredictos justos, especialmente en causas por ofensas graves, serían continuamente anulados. Un acusado sabedor o que voluntariamente quedase ignorante de la falta de competencia de un jurado, podría correr el albur de un veredicto favorable con él en el jurado; y si el veredicto le fuere adverso, podría prontamente jurar el *affidavit* necesario para evitar sus efectos."

Véanse: *George* v. *State,* 39 Miss. 570; *Kingen* v. *State,* 46 Ind. 132; *People* v. *Mortier,* 58 Cal. 267; *People* v. *Evans,* 124 Cal. 206; 16 C. J. págs. 1152, 1153.

El ministerio público ha admitido que el jurado Ayala fué en realidad convicto de *felony,* pero alega que el abogado defensor tenía conocimiento personal de ese hecho en el momento en que hizo el examen de los jurados. Esta corte carece de medios para comprobar si en realidad el abogado defensor poseía esos informes, y por lo tanto no resolveremos esa cuestión. Pero alega además el fiscal, que Ayala fué perdonado y restaurado en el goce de sus derechos civiles y que por tanto era competente para actuar como jurado.

Hemos examinado la jurisprudencia en lo referente a los efectos del perdón y restauración de derechos civiles y encontramos que en *Ex parte Garland,* 4 Wall 333, 380, la Corte Suprema de los Estados Unidos dijo:

"El perdón alcanza tanto al castigo prescrito para la ofensa como a la culpabilidad del ofensor; y cuando el perdón es absoluto ter-

mina el castigo y borra la existencia de la culpabilidad, de tal manera que ante los ojos de la ley el ofensor es tan inocente como si nunca hubiese cometido la falta. Si se concede antes de la convicción, impide la imposición de las consiguientes penalidades y pérdidas de derechos; si se concede después de la convicción, remueve las penalidades e inhibiciones y le restablece en todos sus derechos civiles; le convierte, por decirlo así, en un hombre nuevo y le otorga un nuevo crédito y capacidad . . . .

"En cuanto a la ofensa se refiere, el ofensor queda colocado fuera del alcance de castigos de cualquiera clase. Pero el excluirlo, por razón de dicha ofensa, de continuar en el goce de un derecho previamente adquirido, es imponerle un castigo por aquella ofensa a pesar del perdón."

En *Knote* v. *United States,* 95 U. S. 149, la Corte Suprema dijo:

"Un perdón es un acto de gracia por el cual un delincuente queda libre de las consecuencias de su delito, en cuanto esa liberación es practicable y está bajo el control del poder perdonador o de los funcionarios bajo su dirección. Libra al delincuente de todas las incapacidades impuestas por el delito y le devuelve todos sus derechos civiles. Ante la ley, borra a tal extremo la ofensa, que después del perdón no le puede ser imputada para impedirle el ejercicio de sus derechos legales. Le da nuevo crédito y capacidad, y le rehabilita hasta ese extremo en su nueva capacidad."

Igual doctrina ha sido sostenida por las siguientes decisiones: *U. S.* v. *Padelford,* 9 Wall 531; *U. S.* v. *Klein,* 13 Wall 128; *Armstrong* v. *U. S.,* 13 Wall 155; *Osborn* v. *U. S.,* 91 U. S. 474.

En el caso *Easterwood* v. *State,* 31 S. W. 294, el acusado descubrió, después de rendido el veredicto, que uno de los jurados había sido convicto y había cumplido un término de prisión por el delito de hurto. Basado en ese hecho se hizo petición de nuevo juicio. El gobierno contestó alegando que el jurado había sido perdonado por el gobernador del Estado de Texas. El Código de Enjuiciamiento Criminal de dicho estado dispone que una persona que ha sido

·convicta de hurto no puede actuar como jurado, ni aun con el consentimiento de las partes. La corte resolvió:

"Cuando un perdón absoluto surte efecto, todas las inhibiciones desaparecen, y el concesionario queda como si nunca hubiere sido convicto. La remoción de la convicción necesariamente remueve las inhibiciones, porque éstas no son sino consecuencias de la convicción. Esto, por lo tanto, repondría al interesado en su derecho de sufragio y en su competencia como jurado. Las autoridades son claras en cuanto a estas cuestiones, según las entendemos."

Véanse: *Wickizer* v. *Williams,* 173 S. W. 288; *U. S.* v. *Bassett,* 13 Pac. 237; *Puryear* v. *Commonwealth,* 1 S. E. 512.

Hemos discutido esta cuestión en forma más o menos hipotética por carecer de un récord auténtico que nos ayude a resolverla. Si nos atenemos a los autos presentados por el apelante, tenemos que desestimar la objeción por haberse interpuesto tardíamente y por no aparecer comprobado en forma auténtica que el jurado Ayala fuera convicto de *felony.* Si aceptamos como prueba de la convicción de Ayala la admisión que bajo juramento hace el fiscal, también debemos aceptar su alegación jurada y no contradicha de que el jurado fué perdonado y rehabilitado en sus derechos civiles por el Gobernador de la Isla, en cuyo caso, de acuerdo con las autoridades que hemos citado, Ayala era competente para actuar como jurado y la objeción formulada por el apelante cae por su base.

██ F.—Alegó el apelante que con posterioridad al juicio había descubierto nuevas pruebas que podían favorecerle, consistiendo esa prueba en el testimonio de la esposa del acusado, el que no pudo obtener antes debido al estado nervioso en que quedó su esposa después del suceso.

De los autos no aparece que se hiciera moción alguna por el acusado para el aplazamiento de la vista hasta que a su esposa le fuera posible declarar, ni que se hiciera referencia alguna a la necesidad de ese testimonio para la defensa del acusado. Y se hace difícil creer que el acusado haya estado desde el día 19 de mayo, fecha del suceso, hasta el 8 de

agosto, 1934, día de la vista, sin hablar con su esposa y sin haber podido enterarse de que la declaración de ella podía serle favorable.

El artículo 303 del Código de Enjuiciamiento Criminal, que regula la concesión de nuevo juicio, dispone en su apartado 7 lo que sigue:

"7.—Si el acusado descubriere nuevas pruebas que pudieran favorecerle, las cuales, a pesar de haber empleado la mayor actividad razonable, no le hubiera sido posible descubrir y aducir en la vista de la causa. Al solicitarse la celebración de un nuevo juicio basado en la existencia de nuevas pruebas, el acusado deberá presentar en la audiencia que se le conceda para sustentarlas, las declaraciones juradas de los testigos de quienes se espera la producción de las pruebas aludidas, y si necesitare tiempo para producir dichas declaraciones juradas, el tribunal puede diferir el proveer al escrito en que se pida la celebración del nuevo juicio, por el tiempo que, dadas todas las circunstancias, estime razonable."

No consta de los autos que se cumplieran en manera alguna los requisitos del citado artículo, en cuanto a la presentación en la vista de la moción de nuevo juicio de la declaración jurada de la esposa del acusado. Tampoco se presentó dicha declaración como anexo de la moción. En ésta se hizo referencia a la declaración de doña Camila Ramírez y a la de un perito médico, cuyo nombre no se mencionó; pero no se acompañaron las declaraciones juradas de los testigos propuestos.

La presentación de esas declaraciones juradas es absolutamente necesaria para que la corte ante la que se presenta la petición de nuevo juicio pueda apreciarlas y decidir si ellas serían suficientes para variar el veredicto rendido por el jurado. Así lo ha resuelto esta corte en numerosas decisiones. Véanse: *El Pueblo* v. *Milán,* 7 D.P.R. 456; *El Pueblo* v. *Otero,* 11 D.P.R. 343; *El Pueblo* v. *Viader,* 23 D. P.R. 724; *El Pueblo* v. *Muñoz,* 25 D.P.R. 207; *El Pueblo* v. *Quiles,* 41 D.P.R. 916.

La moción de nuevo juicio en cuanto se refiere al descubrimiento de nuevas pruebas fué propiamente denegada. Y debe desestimarse el error señalado a·este respecto.

■ G.—Se alega como último fundamento de la solicitud de un nuevo juicio, que el veredicto es contrario a la prueba y contrario a derecho. Por eso, aunque no estamos obligados a ello, haremos un resumen de la prueba practicada en el juicio.

El primer testigo de la acusación fué el perito médico Dr. Edgardo Quiñones, quien practicó la autopsia del cadáver de Rafael Vives Nazario y declaró que la causa determinante de la muerte fué la inhibición del corazón producida por la herida de bala que se describe en la acusación.

Declaró después como testigo de cargo Petra McDougal, la que dijo ser hija de Camila Ramírez de Arellano, hijastra del acusado y prometida del interfecto, con quien llevó relaciones amorosas durante los cinco años que precedieron a su muerte; que iba a casarse con el occiso el 19 de mayo, el mismo día del suceso; que ese día Vives estaba en casa de la declarante como a las tres de la tarde, hablando con ella en el balcón; que Vives había bajado a la calle para echar a andar un carro, cuando llegó el acusado en su carro; que el acusado se dirigió a Vives y le dijo que tenía que hablar con él, invitando al mismo tiempo a Vives para que se montara en el carro del acusado; que la declarante le dijo a Vives: "No subas en ese carro"; que entonces Vives le dijo al acusado: "Un momento," vino adonde estaba la declarante y ésta le dijo: "No·quiero que subas en ese carro," y él respondió: "Si tú quieres yo no voy"; que entonces el acusado se dirigió al sitio donde estaban la declarante y Vives, en la escalera de la casa, cogió a Vives por la cintura y le dijo: "Entra para adentro que tenemos que hablar"; que Vives no quería entrar, y el acusado le dijo: "Entra para adentro que no quiero dar un espectáculo aquí afuera; entra para adentro que no voy a hacerte nada"; que en-

tonces entraron a la sala, sentándose Vives en un sillón hacia la izquierda, el acusado hacia la derecha y la declarante en el sofá y Gustavo A. Ramírez hacia la izquierda; que una vez sentados, el acusado le dijo a Vives: "Doña Camila fué al campo a decirme que ustedes querían casarse; ¿por qué quieren casarse?"; que Vives respondió: "¿Por qué no nos vamos a casar? Parece mentira que Ud. y su mamá piensen mal de ella"; que Vives no dijo ninguna otra palabra; que al momento el acusado hizo ademán de sacar el revólver; que Vives tenía una gorra y la puso así (*sic*); que el acusado le disparó a Vives, quien se llevó la mano a la cabeza y trató de andar, y que entonces el acusado le hizo un segundo disparo; que Vives siguió caminando y el acusado se viró y por la espalda le hizo el tercer disparo; que Vives siguió andando y pasó al comedor, cayendo en la puerta de la cocina; que entonces la declarante le dijo al acusado: "Cobarde, mátame a mí también," y se dirigió a la puerta de la cocina donde estaba Vives tirado; que la gorra estaba humeando todavía; que el único que tenía armas era el acusado; que los tres disparos los hizo el acusado, con la mano derecha.

Declaró la sirvienta de la casa, Francisca Ruiz, que desde la puerta del comedor presenció cuando el acusado invitó a Vives a subir a la sala, diciéndole: "Sube, que no te voy a hacer nada, que son tres palabras que voy a hablar contigo"; que se sentaron en la sala y entonces la declarante cerró la puerta en el momento en que el acusado decía a Vives: "Siéntate," y que al instante sonaron tres disparos; que no vió quién hiciera los disparos; que los tres disparos fueron corridos; que en el último disparo Vives salió y voló, se fué contra el seto y cayó al suelo al llegar a la puerta de la cocina, boca arriba; que no vió personas con armas; que cuando la declarante estaba en la cocina oyó una voz que dijo: "Pero qué vas a hacer," y que esa voz era la de Petra McDougal.

José Gabriel Dávila declaró que él acostumbraba ir a varias casas de San Germán a buscar las sobras de comi-

das para sus animales; que el día de autos al pasar por frente a la casa de doña Camila Ramírez vió allí a Vives; que vió cuando llegó el acusado; que Vives y el acusado fueron hacia el automóvil del acusado y éste abrió la portezuela para que Vives entrase, pero nunca entró, y entonces los dos subieron al balcón de la casa; que Petra McDougal estaba en ese momento en el balcón; que al llegar al balcón el acusado dijo: "Pueden entrar que yo no voy a hacer nada," y que entonces entraron a la sala; que la casa tiene cuatro puertas al frente y todas estaban cerradas.

José V. González, Jefe de Distrito de la Policía Insular, de servicio en San Germán el día del suceso, declaró que no conoció al acusado hasta ese día, cuando éste llegó solo al cuartel de la policía, agitado y nervioso, sacó la mano del bolsillo y le dijo al declarante: "Tenga este revólver, que le he hecho *tres disparos* en mi casa a Rafael Vives y creo que lo he herido"; que el revólver que le entregó el acusado tenía tres cápsulas disparadas y tres sin disparar; que el acusado hizo esas manifestaciones espontáneamente, sin que el declarante le hiciese amenazas o promesas de inmunidad; que después de hacer esas manifestaciones, el acusado le dijo: "Yo me reservo en absoluto todo lo que tenga que declarar"; que el acusado le dijo que "un acto de honor y dignidad lo había obligado."

Para sostener la alegada legítima defensa, presentó el acusado las siguientes declaraciones:

Pedro Luis Ronda, declaró que es de oficio tallerista; que el día del suceso salió del taller para hacer un mandado y al pasar frente a la casa de la señora Ramírez estaba el carro del interfecto Vives y que el declarante pudo notar que Vives abrió la puerta izquierda del *dash* y sacó un revólver y lo metió debajo de una gorra; que el *dash* a que se refiere es un cajón que se halla donde está el *espidómetro;* que el revólver era de níquel con cabo negro; que la gorra era blanca; que el declarante se quedó sorprendido y que

en ese momento pasaba por allí, de abajo para arriba, su amigo Mario Gregory y el declarante llamó a Gregory y le dijo: "Ven acá porque aquí parece que va a pasar algo"; que los dos se detuvieron y a los pocos momentos oyeron tres disparos en la casa del acusado; que el declarante no hizo nada en ese momento, pero después subió a la casa; que conoce a Petra McDougal y que la vió en el balcón antes y después de los tiros; que cuando los tiros la vió en el balcón y que después de los tiros el declarante levantó la vista y vió a la señorita Petra que entraba adentro; que el revólver que le muestra el abogado defensor se le parece al que vió en manos de Vives.

A repreguntas del fiscal, el testigo Ronda contestó que conoce a Juan Toro, la persona que se le pone de manifiesto, que se dedica a "vagonero"; que no recuerda las fechas en que trabajó con Toro envagonando cañas en la finca "Filial Amor" de don Ernesto Quiñones; que para el mes de mayo de 1934 no estaba trabajando en dicha finca; que no es verdad que el 19 de mayo de 1934 el declarante estuviese con Juan Toro, como a las 4 p. m., cobrando en el puesto de pago de la mencionada finca; que no estuvo el 19 de mayo en la finca "Filial Amor" y que está seguro de ello porque se encontró en el caso de Rafael Vives Nazario.

Mario Gregory declaró sustancialmente lo mismo que Pedro Luis Ronda y dijo además, que al subir él la escalera se encontró con un hombre que corría hacia abajo y que no conoció a ese hombre. Repreguntado por el fiscal admitió haber declarado en la investigación practicada por el fiscal, pero alegó que no recordaba haber declarado: "Que presenciara, nada, lo que yo puedo decirle es que yo pasé, como a las tres y pico de la tarde, oí tres disparos, me detuve para ver qué pasaba, y vi a Perucho Ramírez bajar de la casa y se montó en el carro y bajó hacia abajo." Y preguntado de nuevo por la defensa declaró que él vió al acusado después del suceso, pero cuando los tiros no lo vió.

Enrique Fernández declaró ser vendedor ambulante de polvos, alfileres y objetos de quincallería; que el día 19 de mayo, pasó por una calle en San Germán y en el balcón de una casa vió una joven a la que ofreció sus mercancías; que la señorita le respondió con un gesto de coraje: "Mire a ver si ahí dentro le quieren comprar algo"; que entonces él subió los cinco escalones y se paró en la puerta y que vió allí a cinco o seis personas, entre ellas al acusado; que no conoce a las otras personas que estaban en la sala, pero reconoce a Petra McDougal, a Gustavo Adolfo Ramírez y al acusado como personas que estaban allí ese día; que el declarante oyó hablar de bodas; que ofreció su mercancía y nadie le contestó; que entonces un señor que estaba allí en mangas de camisa se levantó y se "abrogó" con el acusado; que vió que se "abrogaron" y sonó un disparo fuerte, pero rápidamente sonaron dos detonaciones más; que vió cuando un señor bajito y grueso le dió con el pie a una cosa; que el declarante miró para el suelo y vió que era un revólver y que lo cogió con sus manos, y asustado bajó la escalera y allí por una verja lo tiró y el revólver se fué rodando por una enredadera y cayó al patio; que el que le dió con el pie al revólver era el acusado; que el declarante no entró a la sala, que se quedó parado en la puerta; que no pudo apreciar quién era el que hablaba de bodas; que estuvo allí cinco o diez minutos parado en la puerta; que lo único que oyó fué la palabra "boda"; que el revólver a que se ha referido era blanco con el mango negro, pero no sabe si estaba cargado; que no le dijo a nadie lo que él había hecho con el revólver, ni tampoco informó a la policía ni dijo a nadie nada, porque estaba asustado y no tenía interés en participar en el asunto; que vino a declarar en el juicio porque como 15 o 20 días después del suceso, estando él en el mercado se le acercó un señor bajito y le dijo: "Usted mismo fué el señor que cogió un revólver y lo tiró en el patio de la casa"; que el declarante le respondió que sí, y que al preguntarle el otro si podía servirle, si lo necesitaba, el declarante le dijo que no

tenía inconveniente; que se encontraron por casualidad; que vió cuando los dos hombres estaban "abrogados" y sonó un disparo, pero no sabe quién disparó; que sonaron dos disparos seguidos, pero no pudo apreciar quién los hizo; que él estaba como a diecisiete pies de distancia; que no pudo apreciar cuál de los dos hombres era el que tenía el revólver; que no vió al acusado bajar del sitio del suceso, ni sabe tampoco si el acusado se quedó allí; que el declarante se quedó allí como dos o tres minutos después de los disparos, no se detuvo en la calle y se fué rápidamente.

Alberto Nadal. Declaró ser repartidor de hielo en San Germán; que no conoce las calles de la ciudad, pero que el 19 de mayo se encontraba frente a la casa de doña Camila Ramírez, la señora del acusado; que vió allí a Gustavo Adolfo Ramírez, a doña Camila, al acusado, a Petra la hija de doña Camila, en el balcón; que don Gustavo, doña Camila y el acusado se entraron para adentro y la Srta. Petra McDougal se quedó en el balcón; que conocía a Vives y que también lo vió allí cuando llegó en su automóvil; que Vives se bajó del automóvil y tenía la mano puesta sobre el estómago y una gorra sobre la mano derecha; que Vives subió para arriba de la casa; que el declarante estaba allí parado, porque se decía que esa tarde se casaban ellos y le causó admiración ver que no había animación ninguna; que oyó un murmullo, que se trataba de unas bodas pero no pudo oír muy bien, ni sabe de quién se hablaba; que sintió un disparo muy fuerte y después consecutivamente dos más flojos, pero no sabe quién los hizo; que además de las personas mencionadas vió también allí a un hombre que llevaba unas cajas, que parece que llevaba algunos efectos; que reconoce a Enrique Fernández como el hombre a que se ha referido; que vió a ese hombre cuando cogió el revólver, fué a la escalera y lo tiró al jardín, y que el revólver dió vueltas por una mata y cayó al patio; que el declarante se subió a la escalera y cogió el revólver el mismo día del suceso, se lo llevó y lo tuvo en su poder quince o veinte días; que el revólver a que se refiere es el

mismo que le muestra el abogado defensor, pero que no tiene las balas; que cuando él lo cogió tenía una bala descargada y cinco cargadas; que una tarde, cuando estaba repartiendo hielo, encontró al acusado y le contó sobre el hallazgo del revólver y el acusado le dijo: "Pues yo necesito ese revólver, porque es una gran defensa para mí"; que entonces fueron a buscar el revólver y él se lo entregó al acusado; que antes de los disparos él vió al interfecto cuando entró el último a la sala y que lo vió sentado en la sala; que después Vives se paró y al pararse, con la izquierda le tiró al acusado y se enyugaron, y al enyugarse oyó una detonación fuerte y después dos corridas; que los dos últimos disparos fueron los que se hicieron más rápidamente; que él estaba en la calle parado allí oyendo, pero que no tenía interés alguno en oír; que no vió lo que Vives llevaba debajo de la gorra; que no le dijo a las autoridades ni a ninguna persona que él había visto a un hombre coger un revólver, hasta que se lo dijo al acusado quince o veinte días después; que no sabía que se estuviese investigando el crimen y que no le dió importancia al asunto; que la puerta de la sala, en el momento del suceso estaba entreabierta, o sea tenía abierta una sola hoja.

Por último declaró en su propia defensa el acusado Pedro Ramírez y dijo: Que el 19 de mayo, estando él en el campo, su esposa Camila Ramírez fué a invitarle para que asistiera a una reunión familiar para tratar de la boda de su entenada Petra McDougal con Rafel Vives Nazario; que él era de opinión que los dejaran casarse y que su esposa quería que se retrasara la boda para cuando ella pudiera prepararla; que fué a su casa como a las 2.30 p. m. y cuando subió al balcón vió allí a Petra, a su esposa, Gustavo Ramírez y Rafael Vives; que al subir él al balcón empezaron a tratar del asunto y él propuso que se fueran adentro para que la gente no se enterara; que entonces él y Gustavo Ramírez se dirigieron a la sala y Petra se quedó al lado de la escalera, en el balcón y Vives se quedó allí con ella; que poco rato después Vives entró también a la sala; que doña Camila, su esposa, estaba

parada frente al declarante; que entonces su esposa se dirigió a Vives diciéndole que deseaba dejase la boda para más tarde porque ella tenía que preparar a Petra; que el declarante le dijo a Vives que complaciera a su esposa; que Camila le dijo a Vives que por qué quería que las bodas fueran tan de prisa, a lo que Vives respondió que no veía la razón por qué se oponía a que Petra se casara con él, pues él era de las mejores familias de San Germán, cuando ella era hija de una negra cocinera; que al oír eso, el declarante le dijo a Vives que él no podía permitir eso, que echara para afuera; que Vives le respondió: "Los que nos vamos a salir somos los dos," y se le vino encima con la mano derecha puesta sobre el estómago, tapándose con la gorra, y le tiró con la mano izquierda a la cara; que entonces el declarante le agarró la mano y él tiró el brazo sobre el hombro del declarante, empujándolo; que el declarante con su mano derecha le echó mano donde Vives tenía la gorra, notando que tenía un revólver, y entonces huyó el cuerpo y notó que Vives le disparó un tiro y él creyó que estaba herido, y al mismo tiempo haló su revólver y le disparó a Vives dos tiros; que después de hacerle los dos disparos notó que Vives se aflojó y se le cayó el revólver y entonces él le dió al revólver con el pie, yendo a caer el arma a la puerta del balcón y allí había un hombre vendiendo quincalla, a quien nadie le había hecho caso, y que ese hombre cogió el revólver y se fué; que en el momento de la lucha Petra no estaba en la sala; que después de los disparos bajó, cogió el automóvil y fué al cuartel a entregar el arma; que el Jefe de la Policía le preguntó que cuántos disparos le había hecho y le dijo que dos y que el jefe le dijo: "No, pero el revólver tiene tres balas disparadas" y que entonces él le dijo al jefe que no quería declarar más nada; que al entregar el arma le dijo al jefe que había hecho los disparos en defensa del hogar y en defensa propia; que el revólver tenía tres cápsulas disparadas porque la noche antes sintió ladrar unos perros, se levantó e hizo un disparo, y que ése era el otro casquillo disparado; que cuando él sintió el

primer disparo creyó que Vives lo había herido y que lo iba a matar; que no sacó el casquillo después de disparar a los perros, porque él acostumbra a veces disparar y dejar el casquillo durante meses en el revólver; que no le dijo nada al Jefe de Policía sobre el disparo que hizo a los perros, que lo único que le dijo fué que no pensaba declarar; que no vió a Vives cuando llegó a la casa, que lo vió en el balcón y cuando entró a la sala; que no se fijó en ningún momento en cómo Vives llevaba la gorra hasta que se le tiró encima; que la conversación entre él y el interfecto en la sala duró como diez minutos y que no se fijó dónde Vives tenía las manos, o la gorra o el revólver; que no le dijo al Jefe de Policía que el interfecto le había hecho un disparo, porque se había negado a declarar haciendo uso del derecho que le concede la ley; que no cogió el revólver de Vives porque otro hombre lo cogió, pero que al día siguiente empezó a buscarlo; que el revólver era el mismo que le muestra su abogado; que tuvo ese revólver en su poder hasta dos días antes del juicio que se lo entregó a su abogado; que el revólver se lo entregó a él Alberto Nadal y que es el mismo al que él dió con el pie.

Terminada la prueba de la defensa, el fiscal presentó su prueba de refutación:

Juan Toro, declaró que el testigo de defensa Pedro Luis Ronda estuvo durante todo el mes de mayo y parte de junio de 1934 trabajando con él, envagonando caña, en la finca Filial Amor; que el declarante era quien le pagaba a Ronda sus jornales; que el 19 de mayo, 1934, Ronda estuvo trabajando con el declarante desde las seis de la mañana hasta las tres de la tarde; que después que salieron del trabajo se fueron al sitio donde cobraban, en el barrio Coto, y que allí estaban los cuatro que trabajaban juntos, entre ellos el citado Ronda; y que en ese momento cuando estaban cobrando y estando allí Ronda se recibió la noticia de que habían matado a Vives.

José V. González Bermúdez, Jefe de Distrito de la Policía Insular, declaró que no es cierto que él le preguntara al acusado: "¿Por qué hay tres cápsulas disparadas?", y que el

acusado le contestara: "Sí, pero no disparé nada más que dos"; que lo cierto es que cuando el acusado llegó al cuartel sacó el revólver y le dijo: "Aquí está este revólver, que hice tres disparos y creo haber herido a Rafael Vives en mi propia casa."

Las divergencias y contradicciones entre los testigos de la acusación y los de la defensa, que revela el examen de la evidencia, son explicables si se tiene en cuenta que las teorías de una y otra parte son también divergentes y contradictorias.

Es al jurado a quien corresponde el derecho y el deber de declarar si la prueba es suficiente para sostener la acusación que imputa a Pedro Ramírez el hecho de haber dado muerte a Rafael Vives Nazario, con malicia premeditada y con el deliberado propósito de matarle, o si, por el contrario, la prueba de la defensa estableció satisfactoriamente la defensa propia. Es al jurado a quien la ley otorga también la facultad de juzgar sobre la credibilidad de los testigos, y de dirimir los conflictos o contradicciones que surjan de la evidencia presentada por ambas partes. Y es el deber del tribunal sentenciador y de las cortes de apelación sostener los veredictos, excepto en aquellos casos en que el jurado ha cometido un abuso manifiesto de sus facultades.

Somos de opinión que la prueba aducida por El Pueblo es suficiente para sostener el veredicto rendido por el jurado y que el jurado no abusó en modo alguna de sus facultades al no dar crédito a los testigos de la defensa.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado señor Córdova Dávila no intervino.